**Wiley L. BOLDEN, et al., Plaintiffs,**

v.

**CITY OF MOBILE, ALABAMA, et al., Defendants.**

Civ. A. No. 75–297–P.

United States District Court,
S. D. Alabama, S. D.

April 15, 1982.

James U. Blacksher, Blacksher, Menefee & Stein, Mobile, Ala., for plaintiffs.

J. Gerald Hebert, Ellen M. Weber, Attys., Voting Section, Civ. Rights Div., U. S. Dept. of Justice, Washington, D. C., for plaintiff-intervenor, United States of America.

C. B. Arendall, Jr., William C. Tidwell, III, Rayford L. Etherton, Jr., Hand, Arendall, Bedsole, Greaves, & Johnston, Mobile, Ala., for defendants.

## OPINION AND ORDER

PITTMAN, Senior District Judge.

This cause has been retried by this court upon remand for further proceedings from the Supreme Court of the United States and the Court of Appeals for the Fifth Circuit.

The complaint in this action was filed June 9, 1975. On October 22, 1976, this court entered judgment in favor of the plaintiffs, concluding that the at-large method of electing the Board of Commissioners of the City of Mobile unconstitutionally diluted the voting strength of black citizens. *Bolden v. City of Mobile*, 423 F.Supp. 384 (S.D.Ala.1976). On June 2, 1978, the court of appeals affirmed. *Bolden v. City of Mobile*, 571 F.2d 238 (5th Cir. 1978). On April 22, 1980, the Supreme Court reversed and remanded the judgment of the court of appeals. *City of Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). On September 15, 1980, 626 F.2d 1324, the court of appeals vacated and remanded this court's October 22, 1976, judgment for reconsideration in light of the Supreme Court's decision.

On remand, this court denied a motion summarily to dismiss the complaint and gave the parties the opportunity to present such additional evidence relevant to the is-sues to be resolved on remand. On May 13, 1981, this court granted the motion of the United States to intervene. The court, because of the timing of the motion, limited the government's participation at the retrial but allowed the government to make opening and closing arguments to the court. At an evidentiary hearing additional evidence relevant to the issues on remand was received. The decision rendered herein is based upon the evidence taken at both the original trial and at the additional evidentiary hearings on remand.[1]

The Supreme Court's decision is found in six separate opinions which must be pieced together to determine the Court's directions on remand. This court and the court of appeals found primary guidance in their initial consideration of this case in *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973) and *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973) (en banc), affirmed sub. nom., *East Carroll Parish School Board v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976). These cases established the areas of inquiry for a district court presented with a voter dilution case. Both of those cases predated *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), a case involving an equal protection challenge to employment standards in which the Supreme Court held that proof of discriminatory intent was essential to success on an equal protection claim.

The judgment of the Supreme Court in this case (reversing and remanding) was announced by Justice Stewart in an opinion joined by the Chief Justice and Justices Powell and Rehnquist. Those justices concluded first that in view of this court's finding that the plaintiff class registered and voted without hindrance, there was not a fifteenth amendment violation.

The defendants concede in their brief that a majority of the justices agreed that a voter dilution claim was cognizable under

---

[1] The court has had a similar vote dilution case under consideration simultaneously with the case at bar, *Brown v. Moore*, Civil Action No. 75–298–P (S.D.Ala.1976), involving the Board of School Commissioners of Mobile County. These two cases have substantially parallel histories. The court takes judicial notice of its records.

either the fourteenth or fifteenth amendment.

The plurality next concluded that section 2 of the Voting Rights Act (as it stood prior to the 1975 amendments) simply paralleled the fifteenth amendment and that the substantive elements are the same as those in a direct fifteenth amendment case. The 1975 amendments adding fourteenth amendment protections in section 2 were not addressed.

The plurality addressed at some length the elements of the fourteenth amendment dilution claim in light of *Washington v. Davis*, concluding that a finding that the challenged practice was adopted or maintained for a discriminatory purpose (intent) (at least in part, see discussion *infra*) is necessary for a finding of a constitutional violation.

Finally, the plurality concluded that this court and the court of appeals erred in deciding the case on the basis of *Zimmer* standards, since that case "was quite evidently decided upon the misunderstanding that it is not necessary to show a discriminatory purpose in order to prove a violation of the equal protection clause." *City of Mobile v. Bolden*, 446 U.S. at 71, 100 S.Ct. at 1502. The plurality then applied what it viewed as the correct post-*Washington v. Davis* standards to the fact findings of this court and concluded that those factors fall short of a discriminatory purpose in the adoption of the at-large voting system.

Justice White dissented, arguing that *White v. Regester* remains viable as a method to make findings supporting an inference of discriminatory purpose and that the facts found by this court amply supported such an inference. This position was adopted by Justice Brennan and, apparently, Justice Blackmun, who would have affirmed the liability determination but reversed the court's remedy choice.

Justice Marshall dissented in a lengthy opinion which, at a minimum, agreed that discriminatory purpose could be inferred from the facts found.

2. Justice Marshall did not think purpose (intent) necessary but by a different standard of

Justice Stevens concurred in an opinion which supports a minimal evaluation basis analysis of dilution claims.

Five justices agree, therefore, that this court and the court of appeals applied the wrong legal standard, although no majority agreed on the details of the correct standard.

It appears that six justices agree that discriminatory purpose (intent) is a necessary part of plaintiffs' case. One of the six and the other three justices apparently held such purpose had been shown.[2]

The plurality would require that the proof of intent must be substantially more direct. See the analysis of *Bolden* in, *e.g., Lodge v. Buxton*, 639 F.2d 1358, 1369–75 (5th Cir. 1981); *McMillan v. Escambia County*, 638 F.2d 1239, 1242–43 (5th Cir. 1981). This court has viewed its obligation on remand as proper to take additional evidence and evaluate that evidence and the record and make such additional findings as necessary to decide the issue of discriminatory purpose (intent) under the proper standard. *See McMillan v. Escambia County*, 638 F.2d at 1243–44.

### FINDINGS OF FACT

The court readopts its findings regarding the operative facts and the issue of unresponsiveness, *see Lodge*, 639 F.2d at 1375, previously entered after the first trial. None of these findings were questioned or disapproved by the court of appeals or any opinion of the Supreme Court.

*Statistical Background and the Present Electoral System for the City of Mobile*

Mobile, Alabama, the second largest city in Alabama, is located at the confluence of the Mobile River and Mobile Bay in the southwestern part of the state. *Bolden v. City of Mobile*, 423 F.Supp. at 386. According to the 1980 census, the population of the

proof agreed intent had been shown.

city is presently 200,452 persons, of whom 72,568 (or 36.2%) are black. (Plaintiffs' Exh. 110.) Mobile's 1970 population was 190,026, with approximately 35.4% of the residents black. *Bolden v. City of Mobile*, 423 F.Supp. at 386.

The most recent voter registration statistics were compiled in 1973. At that time, it was estimated "that 89.6% of the voting age white population is registered to vote, [whereas] 63.4% of the blacks are registered." *Id.*

"Mobile geographically encompasses 142 square miles. Most of the white residents live in the southern and western parts of the city, while most blacks live in the central and northern sectors.... Housing patterns have been, and remain, highly segregated." *Id.*

The city is precluded from growing to the east by the bay and river and to the north by other municipalities. The only areas for expansion are to the south and west.

Mobile presently operates under a three-person commission-type municipal government adopted in 1911. (Plaintiffs' Exh. 2b.) "The commissioners are elected to direct one of the following three municipal departments: Public Works and Services, Public Safety, and Department of Finance." *Bolden v. City of Mobile*, 423 F.Supp. at 386 (footnote omitted). Each candidate for the Mobile City Commission runs for election in the city at-large, is required to run for a particular numbered post, and may be elected only by a majority of the total vote. *Id.*, at 386–387. (Plaintiffs' Exhs. 33, 34.) From 1945 to 1965, the city commissioners, upon election, have been required to designate one of their number as mayor, but no provision was made for the assignment of specific duties among the three commissioners. *Id.*, at 386 n. 2.[3]

From the time of the Redeemer legislature of 1874 until the present, no black person has ever been elected to the City of Mobile's governing body.

### History of Mobile Municipal Government 1814–1866

The Mississippi territorial legislature enacted a law providing for the at-large election of seven councilmen for Mobile in 1814. Suffrage at this time was restricted to "landholders, freeholders, and householders" living in the City of Mobile. (Defendants' Exh. 58.) This "pure" system of at-large elections was repealed when Alabama achieved statehood in 1819.

The City of Mobile was incorporated by an act of the new state's legislature on December 17, 1819. This act provided for the at-large election of seven aldermen who would themselves choose a mayor from their number. Only "free white male inhabitants" were allowed to vote. (Plaintiffs' Exh. 5.) In 1826, the legislature amended this act reducing the ranks of the aldermen to six while retaining the at-large feature. Section 2 of this act authorized the mayor and aldermen to divide the city into three or more wards. In this event, ward elections would be held to elect two or more aldermen from each ward, not to exceed nine aldermen in all. (Plaintiffs' Exh. 6.)

The first city elections held under the 1826 law were conducted on March 7, 1826.

---

**3.** In 1965, the system of electing city commissioners was amended so as to require candidates to run for a particular numbered post with specific duties (e.g. Public Safety Commissioner). (Plaintiffs' Exh. 38.) This voting change was implemented by defendant City of Mobile, despite the fact that Act 823 had not received the requisite preclearance under section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c. *Bolden v. City of Mobile*, 571 F.2d 238, 241 n. 2 (5th Cir. 1978). The voting change which assigned specific duties to the numbered posts was finally submitted to the Attorney General for preclearance in 1975. In March, 1975, the Attorney General interposed an objection to the change because it "locks the city into use of the at-large system." *Id., see also City of Mobile v. Bolden*, 466 U.S. at 59 n. 6, 100 S.Ct. at 1496 n. 6. The court takes judicial notice, *Fed.R.Evid.* 201(b) and (c), that in the last municipal elections in July and August, 1981, each candidate for city commissioner announced and ran for a numbered place and in the campaign literature designated Police and Fire Commissioner, Public Works Commissioner, and Finance Commissioner. Those elected are now serving in the respective positions for which they ran.

The ballot included a referendum question on whether or not the newly elected aldermanic government should divide the city into wards. The voters answered affirmatively in favor of ward elections and the city was separated into three wards. (Plaintiffs' Exh. 48.) The 1828–1833 elections were conducted pursuant to this district-type set-up. Two aldermen were elected from each ward solely by the voters of the particular ward.

In 1833, the legislature enacted Ala.Act No. 68 (January 9, 1833), requiring the election of a five-member commission whose sole duty was to divide the city into four wards of equal population. This Act had no effect upon the method of election which continued to elect aldermen on a ward basis. (Plaintiffs' Exh. 7.)

The Mobile election law was amended again by Ala. Act No. 70 (February 4, 1840), creating an eight-member board of common councilmen, who, together with the existing board of aldermen, formed the city's first bicameral government.[4] (Plaintiffs' Exh. 8.) The board of common councilmen was to be elected at-large (i.e. by "general ticket"), with the ward selection procedure retained for the aldermanic branch of the municipal government. *Id.* Thus, Mobile now functioned under its first "two-house" system elected by a hybrid or mixed form of at-large/ward procedures.

The legislature next moved to consolidate the several earlier acts of incorporation of the City of Mobile. Ala. Act No. 221 (January 15, 1844). This statute also altered the municipal government as follows:

(a) Mayor—elected at large;

(b) Common Council—to be comprised of seven members residing one in each ward, elected at large; and,

(c) Board of Aldermen—two aldermen from each ward elected by the citizens of their respective wards.

This law reduced the common council by one member and imposed residency requirements. (Plaintiffs' Exh. 9.) This modification in the 1840 form of government continued until 1852.

In 1852, the number of aldermen to be elected from each ward was increased from two to three, the terms of office for the mayor and common council were increased from one to three years, and the terms of office for the aldermen were staggered such that one-third of the aldermanic board (eight members) would stand for election each year. (Plaintiffs' Exh. 10.) Mobile remained under this electoral system from the 1853 elections until the Civil War.

At no time prior to the Civil War did blacks participate in the political process in Mobile. The franchise was restricted to free white men who had, *inter alia*, paid municipal taxes in the year preceding the election.

At the end of the Civil War, the Union Army administered civil affairs; the city government was reorganized by perpetuating existing officials in municipal office.

President Andrew Johnson established a provisional government in Alabama, with Lewis E. Parsons of Talladega as governor.

Under instructions from Washington, Parsons declared all the laws of Alabama enacted before January 11, 1861, in effect, except those concerning slavery, and tried unsuccessfully to build a new civil government on the remains of the pre-Civil War local and state government. Malcolm C. McMillan, *Constitutional Development in Alabama, 1798–1901: A Study in Politics, the Negro, and Sectionalism*, 90 (1955).

Delegates were elected to a state constitutional convention. The 1865 Alabama Constitution repealed the ordinance of secession, repudiated the Confederate war debt, and ratified the thirteenth amendment. The suffrage requirements, both before and after the convention, excluded blacks. The state legislature proceeded to pass a series of laws, commonly denominated the "Black Codes", which created various civil disabilities for blacks and attempted effectively to return them to a state of servitude.

---

**4.** The 1840 statute also imposed candidate and voter qualifications.

The overwhelmingly conservative and Democratic legislature in 1866 re-enacted the same mixed election scheme as had existed in Mobile before the war. Ala. Act No. 165 (Feb. 2, 1866). The only difference from the 1852 form of government initiated by the 1866 law was that the city was divided into eight wards. (Plaintiffs' Exh. 12.) Negroes were still denied the vote. Only one election, in December of that year, was held to elect one alderman per ward.

### 1867–1909

The year 1867 constitutes a significant turning point in the history of Mobile's municipal government. It is a particularly relevant time in analyzing the issues in this case for it is the time frame of 1867–1911 which is determinative in ascertaining the prerequisite "intent" required by the plurality in the Supreme Court's opinion in *Bolden.* The historical recitation which has gone before serves only as the historical canvas upon which the subsequent years are painted, revealing the true nature of Mobile's at-large scheme of municipal elections.

In March of 1867, Congress passed the first of several Reconstruction Acts, bringing the swift demise of President Johnson's policies in the South and particularly in Alabama. The state became part of the Third Military District under the tutelage of General John Pope. Pursuant to the congressional act, all elections were cancelled, incumbent local officials retained their offices, and vacancies were filled at the pleasure of the military authorities.

Constitutional conventions were convened in the former Confederate states. Their purposes were to repeal the conservative post-Civil War constitutions, to provide for universal male suffrage, to ratify the fourteenth amendment and to establish civil rights for black citizens. The 1867 constitutional convention in Alabama was attended by one hundred delegates, ninety-seven of whom were Republicans. Nineteen of these delegates were blacks, including several from Mobile. The 1867 convention drafted a constitution which was passed through a combination of black support, a white Democratic boycott of the ratification election and congressional legislation passed subsequent to the election, but applied retroactively. This was the first time blacks were allowed to vote in Alabama.

The first state legislative elections conducted under the 1867 constitution were held in February, 1868. The white Democratic boycott continued. Many white males were not allowed to vote because of their refusal to take the loyalty oath. This resulted in the election of an all-Republican delegation for Mobile County, several of whom were black.

On July 20, 1868, the Republican-dominated Alabama Legislature passed an act reorganizing the city government of Mobile. (Plaintiffs' Exh. 12.) The form of government established by the antebellum statutes, as recodified in the 1866 law, was retained. The election provisions of that same law, however, were repealed and replaced by an appointive provision to be exercised by the new Republican governor, William H. Smith. *Id.*

Governor Smith appointed Caleb Price as mayor. Price was a man described both as a conservative Republican and a "Democrat in Republican's clothing." (Plaintiffs' Exh. 14, p. 57 and Exh. 55 at Feb. 12, 1870; Defendants' Exh. 45.) He also appointed eight whites (four of whom were Democrats recommended by Price) to the common council and seven blacks to the 24-member board of aldermen. (Plaintiffs' Exh. 53.) Because these blacks were, for the first time in the history of Mobile, serving on the board of aldermen, many of the conservative whites, Democrats and Republicans alike, refused to take their seats.

These events, coupled with Republican in-fighting over appointments, virtually deadlocked the city government. *Id.*

On December 21, 1868, the legislature passed Ala. Act No. 71 repealing the July legislation and vacating all the Governor's appointments in Mobile. The law also removed the residency requirement which had caused a Republican to be unseated in Sep-

tember. (Plaintiffs' Exh. 13.) Governor Smith made new appointments under the December Act and while there was no election, the process allowed him to pick his appointees, for the first time, at-large. This change seems to have been for the purpose of facilitating the naming of Republicans to the vacated posts. No racial intent can be found in the enactment of this legislation. To the contrary, the Act was highly favorable to blacks and the Republican Party they supported.

The common council appointees had a decided Republican majority, including, for the first time, a black councilman named John Carraway. At least ten blacks were appointed to the board of aldermen. This was a period of great political confusion, with constantly shifting political alliances and factional disputes within the Republican Party. Caleb Price was again made mayor via an election within the council and board.

A special election was held in August of 1869 to fill a vacant seat in the Alabama Legislature as a result of the resignation of black representative James Shaw. The contest pitted white Conservative Democrat Adolph Proskauer against black Republican Allen Alexander.

A legislative committee upon Privileges and Elections reported that in Mobile on election day there had been threatened violence against blacks, to wit,

> Without the least, or certainly without any justifiable provocation, one organization known as a 'Fire Company' who had their engine house only about two and a half squares off from the place of voting, suddenly threw open the doors of their engine house and ran into the street a piece of artillery which had been concealed in said engine house, and actually loaded and trained it upon the crowd at said polls. It is estimated that there was as many as 1,000 voters present at the time, and as may be expected, especially from the timid, hundreds left the place as fast as possible and many of those who were thus intimidated and driven from the polls at the mouth of the cannon, as

well as others who had not been to the polls, but who heard of the condition of things there were prevented from voting. The precise number thus intimidated and driven from the polls, and who did not return to vote, your committee have no means of judging, . . . shows that the vote of this ward was short 1,000 votes from the vote of the former elections, and it can only be accounted for from the violence and intimidation shown to have been practiced at that place.

During the election at a political gathering of whites and blacks there was a riot which resulted in three blacks killed. (Plaintiffs' Exh. 54, Aug. 6, 1869.) Mayor Price was criticized by Republicans and blacks for his response to the incident—the naming of a Committee of Public Safety. Republicans claimed the committee was comprised entirely of Democrats appointed by Mayor Price. (Plaintiffs' Exh. 14, p. 57.)

Proskauer won the election due to alleged vote fraud and violence. (Plaintiffs' Exh. 68.) The investigating committee of the Alabama House of Representatives, looking into these charges, found fraud and terrorism as above set out, but permitted Proskauer to retain his seat because it could not determine precisely the number of votes altered as a result of such actions.

A second legislative election in 1869 placed another Democrat, Jacob Magee, in Montgomery. The Magee victory was shortlived, however, as Republican Alex McKinstry successfully challenged the close election on the grounds that Magee was an unpardoned Confederate officer. (Plaintiffs' Exh. 77.)

With the Republicans still in control of the state legislature, a Dallas County (carpetbagger) senator, Datus Coon, introduced a bill to vacate all of the existing Mobile city offices. This bill was premised on the belief that the Mobile city government appointed in December, 1868, was selling out the Republican cause, was bent on a course of collaboration with white Conservative Democrats and was not going to take the necessary steps to protect black voters and shield them from intimidation and violence.

It is also highly probable this bill was introduced in answer to a memorial placed in the Senate Journal by Mobile blacks. (Plaintiffs' Exh. 14, p. 57.)

The "Coon Bill" was enacted into law on February 8, 1870. Ala.Act No. 97. It had survived several attempts to thwart its passage and had seen numerous substitutes forwarded by conservative Republicans and Democrats fall by the wayside. (Plaintiffs' Exhs. 54, at Nov. 20, 1869, Nov. 21, 1869, Nov. 29, 1869, and 55, at Jan. 11, 1870.) The Act, however, was a compromised piece of legislation resulting from intra-party Republican factionalism and ad hoc alliance between conservative Republicans and Democrats. Originally calling for an appointive procedure exercised by a three-man commission, the final version put the appointive authority in the hands of Governor Smith and scheduled an election to be held in December, 1870. The election procedure (i.e. at-large or by wards) was not specified in the legislation.[5]

A black and Republican-controlled legislature enacted the Coon Bill with full black support. While it is certain not even the Republicans who voted for the final version were totally satisfied with its provisions, such is the nature of the legislative process.

There is every indication that the Republicans and blacks, in passing the compromise version, were betting on their ability to carry the November, 1870 legislative elections state-wide. The Radical Republican cause depended heavily on success in the Black Belt counties in particular. If the Radical Republicans gained full control of the legislature in November, 1870, they would have the opportunity to repeal that provision of the Mobile Municipal Act which called for December, 1870 elections. The Democrats recognized this strategy and warned their constituency about it. For example, the January 20, 1870 edition of the Mobile *Register* reacted as follows to Representative McKinstry's substitute bill, which embodied the same combination of February appointments and December elections:

> Mr. Misrepresentative McKinstry has pushed through a bill to weed out the existing city government, and to appoint the last day of this year for a popular election for municipal officers. The move is somewhat singularly timed. Would McK. trust to a *Democratic* city such an election? We trow not, for he knows the Radicals would be fanned out. What, then, does he trust to? Nothing that we can see but a split in the Democracy. Wait and see how it will turn out. (Emphasis same as in original.)

Almost ten months later the same explanation of Republican aims was repeated. In the November 6, 1870 edition of the *Register*, just prior to the legislative elections, the voters were warned:

> If Democrats do not carry the state, we shall have no municipal elections in this city, and we shall continue to groan under the carpetbag, scalawag and Negro hammer.

The fact is, there was no evidence whatsoever that the election procedure (i.e. at-large v. wards) was ever discussed in the legislature. It is also quite significant to note the legislative history of the Act which reveals the white Democrat Proskauer voting against the final version and the black Republican Carraway voting for it. White Republican Quinn voted in favor of the bill. All these men were members of the Mobile delegation. (Plaintiffs' Exh. 14, p. 334.)

It appears from the evidence presented that the legislators gave little thought to the elective procedures to be utilized. As far as the blacks and Republicans were concerned, the lack of discussion on the elective procedure to be employed lends support to the probability that if successful state-wide in November, the election provision would be repealed. Democrats, cognizant of this probability, displayed race rhetoric frequently in the Mobile *Register*. (Plaintiffs' Exh. 55, at Nov. 6, 1870.) The

---

**5.** The last municipal election had been in 1866 under the "hybrid" at-large/ward scheme enacted in 1840 when the bicameral form was adopted, but blacks were denied the franchise until 1867.

Republican gamble did not pay off and the Democrats took control in November. The Mobile legislative delegation, along with the governor and lieutenant governor posts, went to the Democrats. (Plaintiffs' Exh. 72, at p. 15.)

The municipal elections were held in December, 1870, the first elections since the Republicans took control.

At this time, the evidence reveals a political shift to the Democrats by moderate and conservative Republicans. Frederick Bromberg, a member of the state legislature from Mobile, along with Caleb Price and other conservative Republicans, had by November, 1869 made accommodations with the Democrats. Later, in 1872, Bromberg would win a seat in Congress against Republican opposition, and in the 1874 "Redemption" election, Bromberg would defeat a black Republican for a seat in Congress. Senator Bromberg had opposed the Coon Bill and offered several unsuccessful amendments and a substitute for it.

As the court has previously noted, in all of these debates about the Coon Bill, it appears nothing was said about a change to an at-large election of the board of aldermen. There are at least three reasonable explanations for this: (1) it was not clear from the language of the statute that the aldermen would be elected at-large. Section 11 of the 1870 Act said only that elections would be held in Mobile "by the qualified electors of said city." It may be said that all the principals presumed that, if and when elections were held, they would be carried out in accordance with the 1866 municipal charter, mixed at-large/ward elections. Support for this theory can be found in the announcement in the *Register* on December 6, 1870, the day of the municipal elections, that the lawyers of the Democratic and Conservative Party had studied the election laws and had decided that they meant "the whole ticket from mayor down is to be voted by each elector, both in the ward of the voter's residence." (*See also*, Defendants' Exh. 1, at Oct. 13, 1870); (2) a second plausible explanation is that the conservatives, both Democrats and Republicans, understood all along that, as amended, the 1870 Act would call for at-large elections of aldermen—for the first time in over forty years. Although the Democrats were strictly opposed to Negro suffrage in any form, while the Republicans favored giving blacks the vote, the Conservative Democrats and conservative Republicans had one thing in common, namely, a distrust of black office-holding. Once the conservative Republicans decided to court white Democratic support to enhance their personal political careers, they were more than willing to push through the legislature the at-large election of aldermen that the Democrats favored; (3) there may have been little thought given to the form of election while the bill was being considered, but the question arose as the municipal election neared. The Republican sheriff, an alleged ally of the Caleb Price conservative faction, was the official in charge of the elections.[6]

Beginning in the fall of 1870, Alabama began a period of "Redemption"—a period of several years in which state and local officials sought to regain and restore "white supremacy" in the governmental affairs of the state and in Mobile.

The testimonies of plaintiffs' expert historians show that conservative and moderate Republicans and conservative Democrats appear to have reached some agreement to hold the 1870 municipal elections at-large because they intended to eliminate blacks from holding public office in Mobile. The historians explained that conservative and moderate Republicans, although believing blacks should vote, shared the Democrats' attitude that blacks should not hold office. They knew that municipal elections by ward in Mobile would have resulted in either the election of black officeholders or

---

**6.** Sheriff Granger appeared to be a Republican of the moderate or conservative variety. When Mayor Price had refused to give up his office to Radical Republican George Harrington in February, 1870, it was Sheriff Granger who reluctantly served the papers on Mayor Price. (*See* Defendants' Exh. 1 at Feb. 22, 1870.)

officials elected by black voters, an intolerable circumstance for both conservative and moderate Republicans and Democrats in 1870. The Democratic newspaper waved the flag of race to stir up white voters.

The most reasonable explanation for the Coon Bill's omission to describe the voting procedure was that the legislators assumed that the bicameral municipal government would revert to the hybrid procedures used before the appointive system was enacted, i.e. councilmen elected along with the mayor at-large, aldermen elected from individual wards.

It appears, however, that the local Democrats persuaded Sheriff Granger to hold the elections at-large. This procedure had not been utilized since 1828. Sheriff Granger could have instructed the polling officials that only votes for candidates within their wards would be counted. He apparently did not do so and it is logical to assume that his reason was his desire for at-large elections.

As a result, Mobile municipal elections were held on December 6, 1870, and the Democrats swept all of the city offices by an approximately uniform margin of 4,700 to 3,100 votes. All black candidates lost. No blacks have to this day been elected in the City of Mobile at-large elections.

The effectiveness of the at-large election system in assuring complete victory for white Democrats was so evident in the outcome of the 1870 elections that a year later, in December, 1871, the Republicans declined to field a ticket of candidates. The Democratic ticket was elected without opposition (except for a small scattering of votes) in the 1871 city elections.[7]

Two years later, the Republicans regained the governorship and both houses of the state legislature but Mobile's legislative delegation remained totally Democratic. No amendments were forthcoming to alter the procedure utilized in the Mobile city election of 1870.

The municipal election held at-large on December 3, 1872, was also captured by the Republicans. Allegations of voting fraud were legion. (Defendants' Exh. 1, # 53, Dec. 5, 1872.) Immediately prior to this election, the Democratic and Conservative Party held what is believed to be the first ever white-only primary election to select its candidates for the upcoming municipal election. This primary was conducted on a ward basis rather than at-large. Thus, within two years after the City of Mobile had abandoned the ward election system it had used in general elections since 1828, ward elections were restored in the Democratic white-only primary. The local paper minced no words in explaining the purpose for this scheme:

> The citizens of Mobile are again reminded that the election of Mayor and city officers will be *virtually decided, so far as the white people are considered* at the primary polls on the 25th inst. It is in the primaries that the candidates are to be nominated, and, of course, the names submitted to the primary are in honor bound to be withdrawn if they fail.
>
> We further remind the Democratic and Conservative citizens of Mobile that the contest at the primaries will be a vigorous one, and that their favorite candidate can not be nominated without more than a common effort. Bear in mind that delicate and important municipal interests are at stake, and that our wisest and most prudent and sagacious administrative heads are needed. The financial problem is not a difficult one in the hands of competent men. In the hands of incompetents our municipal affairs will go from bad to worse. In this connection the article headed "Municipal Reform", in our columns this morning, is timely and practical. It shows by actual example what may be accomplished when the right sort of men are set to the work in hand.

Mobile *Register*, November 21, 1872 (emphasis added). It is significant to note that

---

7. It is clear that if the municipal elections had been conducted from wards in December, 1870, instead of at-large, the goal of eliminating blacks from Mobile's government would not have been achieved. (*See* Plaintiffs' Exh. 56, Mar. 5, 1871.)

good government reform was considered synonymous with the elimination of black political influence.

The Democrats steamrolled back to power for good in the 1874 "Redeemer" legislature. One of the most significant laws enacted by this legislature provided for a registration system for each ward. (Plaintiffs' Exh. 15.) This statute, Ala.Act No. 365 (Nov. 28, 1874), also made at-large general elections an express feature of city government in Mobile. Plaintiffs contend the purpose of the plan was, in part, to discriminate against blacks. (*See* Mobile *Register,* December 4, 1872.) Defendants counter that its true purpose was to prevent the widespread voter fraud accompanying the 1872 municipal election. There appears to be some truth in both positions.

Four months prior to the 1874 legislative election, the Mobile *Register* was filled with advertisements and editorials urging white voters to turn out in large numbers; e.g., "let white men unite!" *Register,* July 1, 1874, July 2, 1874. The banner headline of the November 4, 1874, *Register* proclaimed: "The strike for freedom. White supremacy sustained. The white men as a unit." There was considerable violence associated with the "Redemption" election in Mobile. White horsemen shot down black voters on their way to the polls in the streets of Mobile. One black person was killed, four were wounded, and countless others were frightened away from the polls.

Under the new registration provisions, the number of registered voters dropped substantially. Only some 60% of the eligible voters registered under the law.

The Redeemer Constitutional Convention was held in 1875. *Inter alia,* the new constitution repealed the provision of the 1868 Constitution that had given the State Board of Education legislative authority in educational matters.

Then, in the 1876 session, an act was passed repealing the 1870 election scheme for Mobile County School Commissioners that had assured minority representation. Ala.Act No. 242.

The 1875 Constitution, adopted in the spirit of state-wide "Redemption", re-established the local autonomy of the Mobile County school system and required "that separate schools for each race shall always be maintained by said school authorities." Alabama Const. (1875), art. XII, section 11.

The Redeemer Alabama Legislature met again in 1876. Virtually everything done in this legislative session had a racial connotation. The fundamental program of the conservative Redeemers was to do away with the restraints Reconstruction had placed on white supremacy. As part of this program, a law was passed doing away with the Mobile County School Board election system that afforded minority access, replacing it with the at-large election scheme, which remains in effect to this date. Acts of Alabama (1875–76), No. 242, p. 363. The Act provided for at-large elections on a countywide basis, but required that two of the nine commissioners must reside within at least six miles of the county courthouse. It further provided for staggered six-year terms with three commissioners to be elected every two years. The restriction against full-ticket balloting was eliminated.

Both expert historians who testified about these events, an Associate Professor of History at the University of South Alabama, and a Professor of History at the California Institute of Technology, were of the opinion that the change to the present at-large scheme in 1876 was intended to exclude blacks and their white Republican allies from representation on the school board.

The court finds from these facts (including the codification of the at-large feature in 1874) that these events were done *because* of their derogatory effect on black political participation.

*1879–1909*

In 1879, the legislature changed the form of Mobile's government. Ala.Act No. 308 (Feb. 11, 1879). A "Port of Mobile" was created, to be governed by eight commissioners who together comprised the "Mobile Police Board." The form of at-large elections was not changed.

In the 1884 municipal election, the Democratic Party split into two factions. The recalcitrant Democrats coalesced with the Republicans and tendered a slate under the Citizens Party banner. This alliance was successful and the candidates proffered by the Citizens Party won the 1884 municipal elections.[8]

To heal this breach in the Democratic Party and lessen the chance of such problems in the future, the Democrats enacted legislation providing for primary elections. The continued practice of ward primaries enabled Mobile's Democrats to resolve their political differences in the white primary and then run a united campaign in the general election. The legislature enacted the first formal primary election law in Alabama in 1893 (for Mobile) as opposed to a Democratic party practice started in, to wit, 1872. The state-wide counterpart would not materialize until 1903.

The legislature resurrected the bicameral form of government for Mobile in 1886. The Act provided for one councilman elected from each of the eight wards by the voters at-large and seven aldermen elected at-large without residency requirements. The white Democratic primary elections after 1886 were conducted on a "mixed" basis; that is, the councilman for each ward was selected solely by the voters of that ward, while the aldermen were elected by the voters of all the wards. The white Democrats were in the political saddle.

In 1893, as a reaction to growing support for the Populist movement, the legislature passed a complex election statute (the Sayre Law) which was designed to disfranchise both blacks and illiterate, lower class whites, those groups being perceived as likely supporters of the Populist platform.

The law required that: (1) biennial voter registration be conducted in May, over a month before state office elections and five months before the national elections; (2) voters were to display their registration certificates at the polls; (3) illiterate voters were to be aided only by assistants appointed by election officials, and (4) the governor directly appoint all voting registrars, and need not guarantee representation of Republicans or Populists on registration or election boards. The law was quite successful. See J. Morgan Kousser, *The Shaping of Southern Politics: Suffrage Restrictions and the Establishment of the One-Party South, 1880–1910*, at 138 (1975); Sheldon Hackney, *Populism to Progressivism in Alabama*, at 148–49 (1969). The express purpose of the law, according to its author, was to legally eliminate the Negro from politics in Alabama. *Id.* at 134. Black voter turnout statistics after 1892 showed that the Sayre Law substantially accomplished its goal of disfranchisement: black participation in terms of voter turnout dropped by twenty-two percent (22%) from 1892 to 1894 and thereafter remained below fifty percent (50%).

In 1897 a new municipal charter was enacted for the city, Ala.Act No. 214, merging the two existing units of government into a unicameral general council. The at-large provision was not altered.

In 1901 a convention was held to rewrite the outmoded Constitution of 1875. The convention was controlled by the conservative and Black Belt factions of the Alabama Democratic Party, who pledged openly to adopt those measures which would disfranchise the greatest number of blacks and poor illiterate whites.[9] The intent to pur-

---

**8.** The 1884 race for U. S. Congress in Mobile illustrates that the influence of the Citizens Party was not limited to municipal elections. In that race, a black Republican by the name of Frank Threat came within 90 votes of winning Mobile County. Such a small margin of victory for the Democrat over a black Republican in 1884 would imply that the Citizens Party cast its votes for the black candidate. James G. Blaine, the Citizens Party candidate for President, lost Mobile by only nine votes.

**9.** The 1901 Constitution, as ratified, contained a plethora of voter qualifications: a $1.50 annual, cumulative poll tax; a one-year employment requirement; lengthy residency requirements; property ownership requirements; a literacy test; a petty crime provision; and, as a final barrier, powerful boards of registrars with broad discretion in registering eligible voters. The Constitution also contained a fighting grandfather clause (allowing the registration of

posefully discriminate in this manner demonstrates the continuing concern of Alabama politicians over blacks voting and holding office.

The Constitution of 1901 was highly effective in achieving its purposes. By 1909 all but some 4,000 blacks had been removed from the rolls of eligible voters in Alabama. However, in spite of the Sayre Law and the 1901 Constitution, in 1910 there were still 193 blacks registered to vote in Mobile.[10]

Ala.Act No. 797 (Aug. 15, 1907) set out a comprehensive municipal reorganization plan applying to all cities in the state, *including Mobile*. The Act provided for *single-member district election* of aldermen in the general election. The mayor and president of the board of aldermen were to be elected at-large.

It is apparent that the 1907 legislature was confident that the 1901 Constitution had effectively removed black political efficacy when this state-wide municipal reorganization act was passed. It also appears that Mobile's representatives and civic leaders had little to do with this reorganization act, the impetus coming primarily from Birmingham and Montgomery.

The first election under the 1907 Act was conducted in 1908. In Mobile, the 1908 municipal election was characterized by the return of the race issue. Mayor Pat Lyons was accused by his opponents of trying to manipulate the black vote. The *Mobile Daily Item*, a newspaper that supported Mayor Lyons, reported on April 24, 1908, about a meeting on the preceding night of the Mobile County Democratic Executive Committee, chaired by George J. Sullivan:

The primary will be purely Democratic and only WHITE Democrats will be allowed to participate. This decision was made by Chairman Sullivan in answer to a direct question from Mr. Flournoy as to

the meaning of the report of the rules committee. The chair held the state committee had decided that only white Democrats could participate. Mr. Flournoy, to be more explicit, asked if Creoles would be barred and the chair answered in the affirmative.

Elsewhere in that same edition of the newspaper was the following:

The Mobile County Democratic Executive Committee last night followed the rules of the state committee and the strict letter of the law when it declared that the primary of May 18 should be a strictly family affair.

In other words, this primary, contrary to a long established custom in the party, will only be participated in by white Democrats. This drawing tightly of the color-line, however, was not the act of the Mobile County committee, nor that of its efficient chairman, Hon. George J. Sullivan. It was in accordance with the rulings of the State Committee which acted strictly in accordance with the Primary Law, as laid down in the Code.

This type of rhetoric continued until the election. On May 15, 1908, the Mobile *Register* printed a letter to the editor from T. C. DeLeon, which complained about "the attempt to deliberately mongrelize the primaries of the White Man's Party." The concern was that, if blacks were allowed to participate in the primary, they might next want to seek office:

The Negro, if not ambitious, is as mimetic as his Darwinian prototype. Admitted to full Democratic communion table in Mobile, what assures against his claim to sit at his head: what forbids—in the law of logic—his demand to be put upon its tickets, or even to head them?

In the May, 1908 primary, Mayor Lyons defeated his opponent Shepard 2,434 to

---

anyone who had fought for the Union or the Confederacy, or had fought in any other United States war, and his descendants) that guaranteed white suffrage, notwithstanding the above qualifications.

**10.** The plaintiffs' figures show the black voting age population in Alabama was 181,471 and the

white voting age population was 232,294. (Plaintiffs' Exhs. 97, 98.) By 1903, the number of registered black voters had declined to 2,980, whereas the number of whites registered was 191,492. In Mobile County, 193 blacks and 7,104 whites were registered to vote around 1903.

1,299. Lyons' political ally, Thomas S. Kaver, defeated his opponent in a black ward by 229 to 115.

The racially charged municipal elections of 1908 were followed in the very next legislative session of 1909 by the first attempt to enact a city commission bill.

The 1870 Act was probably not created for an invidiously discriminatory purpose, the interpretation of how it was to be conducted was clearly derived from intentionally racist purposes.

Summarizing the changes from 1870 through 1907 and the underlying motivations of the lawmakers, the court finds first that the 1870 Act was implemented at the local level, and its ambiguities resolved, with the design to eliminate black influence on municipal elections. During the period 1874 to 1907, white supremacist Democrats controlled legislative and municipal positions. All Mobile elections were conducted at-large, though the Democrats selected their candidates by ward with only whites voting. The at-large elections were utilized to negate black influence. The 1901 Alabama Constitution had as a principal purpose the disfranchisement of blacks, the natural and intended consequence of which was to preclude black office holding. That purpose was in general successful, so that most black voting had been eliminated by 1907. The 1908 ward elections in Mobile, however, demonstrated that the remaining black voters had some influence in black wards.

All of this provides relevant background as to the motivation for the adoption of at-large voting in 1911. The existence of ward voting in 1908 through 1910 creates a gap in the chain which requires more detailed analysis of the motivation for the adoption of at-large voting in 1911.

Additionally, the "pure" at-large scheme was retained from 1872 to 1907 to purposefully exclude effective black political participation, i.e., an invidious discriminatory intent. The de facto elections, the all-white Democratic primaries elected by wards after 1871, excluded blacks.

In 1907 when state-wide factions passed a municipal reorganization bill, they no doubt were satisfied that the black vote was eradicated or at least "safe". However, the small black vote in Mobile effective only in one ward was of unusual great concern as evidenced by the elections of 1908–1910. This demonstrates the extent and pervasiveness of racial prejudice and discriminatory intent. As soon as it became apparent in 1908 that the black vote was still of consequence, Mobile leaders jumped aboard the fledgling commission government bandwagon. Thus, due to the "gap" of 1908–1910 when elections were conducted by single-member districts, the court must answer the question whether the 1911 at-large commission form of government was adopted for racially discriminatory purposes.

The commission proponents in Mobile heralded the proposed change as a "progressive reform." The court has noted earlier, however, that the disfranchising constitution of 1901 and the white primary were also promoted as good government reforms.

The majority of news reports and oration parrotted the catchwords "efficiency", "business like", "anti-corruption" and the like. However, the elections of the past two years were not forgotten. These were characterized by charges of manipulation of the black vote. The arguments against ward-heeling and corruption voiced by commission proponents in 1909 and 1911 clearly had racial overtones. For example, on May 6, 1911, the month before the referendum election, the Mobile *Register* carried an article that told of the shift to commission government in the nation's capitol: "Washington, D. C., when the local government became too corrupt by reason of the large percentage of ignorant Negro voters, it was given a commission form of government, with the appointing power vested in the president."

Advocates of the change had some concern about the legitimate advantages of the commission form of government.[11] How-

---

11. The court in *Village of Arlington Heights v.*

*Metro. Housing Dev. Corp.*, 429 U.S. 252, 265,

ever, the anti-democratic dilutive effect on the lower classes was also argued. In those blatantly racist times, the resulting effects on the black vote were readily apparent.

White leaders in Mobile, while relieved that disfranchisement had removed the immediate threat of black officeholding, were seriously concerned about a possibility of blacks regaining the franchise, perhaps even in the near future. For example, on May 4, 1908, the Mobile *Register* published a viciously racist editorial entitled "White Supremacy":

> Senator [Ben "Pitchfork"] Tillman was right in uttering his solemn warning to the country that the preaching of social equality in the North is full of danger to the Negroes of the South. The white people of the South do not intend to recognize that any equality is possible; neither do they intend to recognize any superiority due to numbers of the colored race.... The Republic was a white man's conception, a white man's product, was instituted for the white man, and can be maintained only by the white man. Under Negro auspices it would go to ruin in a generation's life time. The Negro can prosper in this country as long as they recognize the white supremacy. If they are induced by their injudicious friends of the North to revolt from this dependent position, they are sure to provoke the action mentioned by Senator Tillman. The white man has never brooked an equal of another race and he never will. If this issue is made, the very existence of the inferior race will be in question.
>
> The southern white man has found a plan for dominating without resort to either cruelty or barbarity; and it is the best solution yet conceived whereby two radically different races may live in peace in the same land; but some theorists of the North fancy that it is a wrong solution and that the equality of the races can be established. It is a great mistake on their part, and if persisted in may cause trouble, especially to their proteges, the Negro. We advise them, as does Senator Tillman, to let well enough alone.

Perhaps the most explicit expression of white Mobilians' concern over the possible undoing of black disfranchisement is an open letter to the legislators by Frederick Bromberg published in the July 25, 1909 edition of the *Register*. This is the same Frederick Bromberg who was the Senator from Mobile in 1870, when the exclusive use of at-large elections in Mobile municipal government was adopted, who had been elected twice to Congress in the 1870's from Mobile, and who, most recently at the time of this writing, had been President of the Alabama Bar Association. In this letter to the Mobile legislative delegation, Mr. Bromberg was expressing support for a pending bill to amend the Alabama Constitution explicitly to outlaw black office-holding:

> Respectfully now recall to your mind that portion of my address as present [sic] of the state bar association, a copy of which I sent to you, which refers to the expediency of amending the state constitution so as to exclude negroes from holding elective offices in this state.
>
> You know that it was the effort to obliterate the negro vote in the past which led to all of the methods of fraud perpetrated at the ballot boxes by sworn election officers in order to defeat the negro vote, which demoralized the growing generation of young men, and to cure which was the avowed purpose of the sections in the present state constitution regulating the franchise.

97 S.Ct. 555, 563, 50 L.Ed.2d 450, 464–65 (1977), speaking of legislative intent under *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), said:

> Davis does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes. Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the "dominant' or "primary" one. In fact, it is because legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality.

(footnote omitted).

We have always, as you know, falsely pretended that our main purpose was to exclude the ignorant vote, when, in fact, we were trying to exclude, not the ignorant vote, but the negro vote.

The present measures are so framed that if honestly carried out they will not and cannot disfranchise the negro. If not honestly carried out sooner or later, probably sooner, a case will be made up having back of it competent counsel, which will go to the supreme court of the United States, and which will overturn the present methods of applying the registration laws.

The only safety of our people lies in availing themselves of their rights under the constitution of the United States to disqualify the negro from holding any elective office.

Further on in his letter, Mr. Bromberg warned:

The counties of Dallas, Wilcox, Monroe, Marengo, Perry, Greene, Hale and others, composing the Black Belt of the state, will become increasingly black with increasing years, and the negro with intelligence, and property will demand and insist on his legal rights through the courts. Not only that, but ambitious men amongst them will avail themselves of their superior numbers in said counties to offer themselves as candidates for offices of power and profit. As surely as the war between the free and slave-holding states followed from the existence of slavery, just so surely will race war in this state follow the present condition of our laws; unless the remedial measure suggested above be adopted: the oldest of us will yet live to see my prophecy fulfilled.

At present the masses of the colored race are indifferent to the right to vote and still more indifferent to the right to hold office; by adopting remedial measures now we shall cause no discontent, because of the present apathy of our colored citizens.

This is fully recognized by all statesmen.

Statements like these by persons who were zealous supporters of the commission form of government, when considered in light of the history of events leading up to the change in government, lead unerringly to the conclusion that commission advocates were not simply aware of its exclusionary effects on blacks, but affirmatively desired and intended that result. Defendants' historian admitted that the change would not have been enacted had it been favorable to black electoral strength.

Plaintiffs introduced other evidence of racial motives in the newspapers. They show articles where anti-commission rallies were described as consisting of "women, children and colored." (Plaintiffs' Exh. 117.) This tactic was apparently designed to show that blacks opposed the commission form and was an attempt to draw white support for the change by "race-baiting." Muted or code words were the order of the day. At that time the white business and community leadership was concerned over the bad national press Mobile had received arising out of the 1906, 1907 and 1909 lynchings in Mobile which might discourage the city's growth.

Defendants countered that this was simply a "red herring", that the presence of racial remarks was very common in this day and time and its appearance was not always meaningful. Hence, race was not a true motive involved in the change to commission government.

The court finds that these remarks are classic examples of injecting race into an inflammable, racially-charged atmosphere where only a spark is needed to set off a conflagration. The injection of race into the situation was for the purpose of inflaming voters and gaining their support. In view of Bromberg's admissions in his 1909 letter, good government, reform efficiency and the like became "codewords" and euphemisms for anti-black sentiments.

These apparent innocent words when viewed in the context of prevalent racial bias of the times were racist. This is a realistic view. These words were red herrings to camouflage racial intent.

The defendants do not recognize these articles as evidence of racial intent and would have the court conclude there is no evidence to support plaintiffs' claims. The court does not believe intent can be dismissed as non-existent based on the quantity of evidence. This is not a game of numbers. The inflammatory and subtle remarks made in a culture saturated with racial prejudice and fear revealed by the evidence demonstrates conclusively to the court the quality of attitudes and beliefs necessary to infer the requisite intent.

The first decade of the twentieth century in Mobile saw racial problems erupt into violence. Two black prisoners were lynched by a "respectable mob" in 1906, and a second lynching occurred in 1907.

Racism continued to be evident. The May 4, 1908 Mobile *Register* editorial, *supra*, pp. 31–32, appeared during the time the commission movement in Mobile was growing in popular support. The *Register* and its editors were vanguards of the movement.

In 1909, a "disorderly element" lynched another black prisoner when the sheriff gave the lynchers access to the jail. The *Register* reported that Mobile was plagued by the "everlasting Negro question."

It was at the height of the racially-charged period that Mobile organized its first effort to enact a city commission bill. On July 6, 1909, a large group of Mobilians met to discuss a bill proposed by State Representative W. E. Urquhart of Birmingham providing for a commission form of government for Birmingham and Montgomery.

Prominent citizens, including Erwin Craighead, editor of the Mobile *Register*, and A. C. Danner, chairman of the general meeting, agreed that "Mobile should combine with those two cities and advocate a general law permitting the citizens of the municipalities to vote on the question of adopting that system." (Defendants' Exh. 1, at July 7, 1909.)

Mr. Danner's support for the change in government in Mobile was racially motivat-ed. He explained the need for "good government" reform in a January 31, 1909 Mobile *Register* article as follows:

A year ago Mobile met with a check in her progress.... We are desirous of bringing about a reaction and an upward movement toward further growth and more prosperity in our city as soon as possible. To do this we want to get white people to move and settle here with us, bringing their ability and money.... We cannot hope for an increase in population here unless we can offer to the newcomers good government.

On the contrary, I have heard of more than one person speaking of leaving Mobile. I heard a man who has been quite useful to Mobile say ... that he felt like taking his family and going to a place where there are no negroes. He was tired of the everlasting negro question.

(Plaintiffs' Exh. 64, at Jan. 31, 1909.)

A second participant, Laz Schwarz, acting member of Mobile's Board of Works, also supported the commission government, "provided the question may be submitted to the *white* people of Mobile, and that they be permitted to elect their own commissioners." (emphasis added) *Id.*

### 1911–Present

The commission form of government received modifications in 1915, Ala. Act No. 749 (increased commissioners' terms to six years and staggered elections every two years), in 1939, Ala. Act Nos. 246, 283 (decreased terms to four years and eliminated staggered terms, assigned specific functions to each commissioner), again in 1945, Ala.Act No. 285 (established numbered posts for commissioners), and finally in 1965, Ala. Act No. 823 (assigned specific administrative duties to each commissioner). The court finds no evidence of racial motives in these changes. The only evidence admitted reveals bona fide and legitimate reasons for these alterations. *See Bolden v. City of Mobile*, 423 F.Supp. at 394 n. 9.

In 1964, Mayor Joe Langan set up a blue-ribbon committee (which included several

black members) to investigate the possibility of making changes in the existing commission form of government or changing to another form of government. The committee, denominated the "Mobile Charter Commission", reported in February of 1965 in favor of a commission-council form of government with a hybrid plan of five single-member districts and four at-large seats for the council members. (Plaintiffs' Exh. 119.) The recommendations were submitted to the Mobile legislative delegation. The delegation, however, chose to adopt its own plan providing for an at-large election system. Ala. Act No. 823 (1965).

The senator and legislators from Mobile all testified [12] at the hearing that there was no discussion of race or the use of a single-member district provision during Act 823's progression through the legislature.[13] It is clear that the legislators were aware of the racial implications of single-member districts, this had been discussed previously in reference to the legislative reapportionment issue. In such a situation a discussion of race was unnecessary. In the 1960's most of Alabama's political leadership was loud and vociferous against all efforts to promote racial equality. It was during this period that the bus boycott occurred in Montgomery, the police dogs and fire hoses were used in Birmingham against blacks, a black church was bombed in Birmingham resulting in the death of blacks, and the Selma to Montgomery march took place. Anything to increase black representation just would not fly. To have advocated black representation would have constituted political suicide. There was certainly an intent to maintain the at-large election system for racial motives.

Plaintiffs have argued that the growth of the city via annexations was done to maintain a white majority population. No persuasive evidence was admitted supporting such an argument.

## JURISDICTION

The United States is a party to this lawsuit. There is no question that the United States may maintain an action pursuant to Section 12(d) of the Voting Rights Act of 1965, 42 U.S.C. § 1973j(d), to enforce the guarantees of section 2 of the Act. This court has jurisdiction of such an action. 28 U.S.C. § 1345; 42 U.S.C. § 1973j(f).

*Private Right of Action* [14]

## CONCLUSIONS OF LAW

A. *The Statutory Claim—Purpose or Effects Test*

The court will first make an analysis of the scope or coverage of the Voting Rights

---

**12.** As regards this practice the Supreme Court in *Arlington Heights* said:

> The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports. In some extraordinary instances the members might be called to the stand at trial to testify concerning the purpose of the official action, although even then such testimony frequently will be barred by privilege. See *Tenny v. Brandhove,* 341 U.S. 367, 95 L.Ed. 1019, 71 S.Ct. 783 (1951); *United States v. Nixon,* 418 U.S. 683, 705, 41 L.Ed.2d 1039, 94 S.Ct. 3090 [3106] (1947); 8 J. Wigmore, Evidence § 2371 (McNaughton rev. ed. 1961).[18]

Continuing at footnote 18:

> This Court has recognized, ever since *Fletcher v. Peck,* 6 Cranch 87, 130–131, 3 L.Ed. 162 (1810), that judicial inquiries into legislative or executive motivation represent a substantial intrusion into the workings of other branches of government. Placing a decisionmaker on the stand is therefore "usually to be avoided." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 420, 28 L.Ed.2d 136, 91 S.Ct. 814 [825] (1971). The problems involved have prompted a good deal of scholarly commentary. See Tussman & tenBroek. The Equal Protection of the Laws, 37 Cal.L.Rev. 341, 356–361 (1949); A. Bickel, The Least Dangerous Branch 208–221 (1962); Ely, Legislative and Administrative Motivation in Constitutional Law, 79 Yale L.J. 1205 (1970); Brest, supra, n. 12.

**13.** One member of the Mobile House delegation in 1965 testified that it would not have been politically smart for him to propose any act that would have increased black participation in Mobile government. The general climate was just too tense.

**14.** The United States had been allowed to intervene. The defendants apparently felt no need to address this issue and did not. This court considered it not to be an issue and it is not addressed herein.

Act § 2 claim. Six of the justices in *Bolden* declared that Section 2, premised on the fifteenth amendment, does not support a claim of voter dilution when there was no purpose (intent) to discriminate. It is noted that their holding was based on the pre-1975 language of section 2 and its single constitutional basis of the fifteenth amendment. The 1975 amendments clearly extended the scope of the Act to protect fourteenth amendment rights as well.

These changes aside, it seems from an analysis of the six separate opinions in *Bolden* that the Court would find a *voter dilution claim* arising out of the fifteenth amendment but the standards varied. Six impose a purpose test. Stewart, J., the Chief Justice, Powell, J., and Rehnquist, J. did not think the evidence supported such a finding. 446 U.S. 62, 100 S.Ct. 1497. Stevens, J. concurred specially but would impose a different standard. *Id.* at 83–94, 100 S.Ct. at 1508–1514. White, J. thought the evidence supported an inference of intent. *Id.* at 103, 100 S.Ct. at 1518. Marshall, J., *id.* at 103–141, 100 S.Ct. at 1518–1540, would find voter dilution on different standards. Brennan, J., *id.* at 94, 100 S.Ct. at 1514, agreed voter dilution had been established. Blackmun, J., *id.* at 85–86, 100 S.Ct. at 1509–1510, apparently agreed voter dilution had been established but objected to the remedy. *Accord Lodge v. Buxton*, 639 F.2d at 1364 n. 11; *United States v. Uvalde Consol. Ind. Sch. Dist.*, 625 F.2d 547 (5th Cir. 1980); *cert. denied*, 451 U.S. 1002, 101 S.Ct. 2341, 68 L.Ed.2d 858; *McMillan v. Escambia County*, 638 F.2d 1239 (5th Cir. 1981) *cert. denied* 453 U.S. 946, 102 S.Ct. 17, 69 L.Ed.2d 1033 (1981).

■ This court notes that the legislative history of the Voting Rights Act of 1965 makes no mention of at-large systems. However, in House Report No. 91–397 explaining the 1970 amendment, the committee's statement in favor of extending the temporary provisions of the Act pointed out that:

> The record before the committee indicates that as Negro voter registration has increased under the Voting Rights Act, several jurisdictions have undertaken new, unlawful ways to *diminish the Negro* franchise and to defeat Negro and Negro-supported candidates. The U. S. Commission on Civil Rights has reported that these measures have taken the form of switching to *at-large elections where Negro voting strength is concentrated in particular election districts* and facilitating the consolidation of predominantly Negro and predominantly white counties. H.R.Rep.No.397, 91st Cong., 2d Sess. (1970), *reprinted in* [1970] U.S.Code Cong. & Ad.News 3277, 3283. (emphasis added).

This passage points out that Congress apparently intended for the Act to encompass vote dilution claims arising under the fifteenth amendment. Even so, the addition of the fourteenth amendment as a new constitutional basis in the 1975 amendments certainly requires this court to hold a vote dilution claim cognizable under section 2.[15] The Act was intended as a comprehensive blanket to smother the flames of discrimination in voting. To find that section 2 does not encompass a vote dilution claim would leave a technical loophole the proponents of this legislation thought was covered. This court does not read the Act so narrowly and is of the opinion that the weight of authority and reason favors the conclusion that section 2 does encompass and prohibit vote dilution.

Since this court did not discuss section 2 in its 1975 opinion, it will address now the plaintiffs' argument that the Voting Rights Act of 1975 contains a single substantive

If the court is mistaken, the parties are requested to file an appropriate motion addressed to this court.

15. The legislative history of the 1975 amendments, commenting on *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), reiterated the view that Congress intended, in extending and amending the Act, to broaden its scope and coverage to all forms of voter discrimination which had existed originally or evolved in defiance of Congress' purposes in passing this legislation. S.Rep.No. 295, 94th Cong., 1st Sess. 27–28 (1975), *reprinted in* [1975] U.S.Code Cong. & Ad.News 774, 793–94.

standard—the effect test of section 5 and in particular that this standard applies to section 2 rather than a "purpose" test. This court does not agree.

*Bolden* reveals that the question of which standard to apply under section 2 was not directly addressed.[16] Defendants assert that section 2 requires the purpose test because, *inter alia,* no post-*Bolden* case has held that a showing of effect is sufficient. The parties have not shown, and this court has not discovered, any Fifth or Eleventh Circuit precedent which directly confronts the issue. *See United States v. Uvalde Consol. Ind. Sch. Dist.,* 625 F.2d at 544 n. 12.

The court now directs its inquiry into whether section 2 post-amendment, buttressed by the fourteenth amendment, requires proof of intent or effect. It is appropriate to again examine the legislative history of the Act.

It is important to understand the framework of the Voting Rights Act of 1965. It does not affect all states in like manner. "Covered" states and political subdivisions are subject to a series of special statutory remedies.[17] Similarly, the Act reveals the congressional belief that some voting changes and procedures (i.e. "tests or devices") are more suspect than others and as such receive disparate treatment under the Act.

The discussions in the legislative history show substantial concerns over what events were so suspect as to require "automatic" review and which were considered of lesser importance unless applied in a discriminatory fashion.

The enactment of "tests or devices" to restrict the franchise was found to be the most common method of discrimination and, therefore, under section 3(b), a judicial determination of purposeful or effective discrimination authorized their suspension.[18]

Sections 4(a) and 5 are examples of the disparate treatment among the jurisdictions. In the "covered" jurisdictions,[19] section 4(a) automatically suspended the use of "tests or devices" and section 5 mandated prior federal approval of any voting changes subsequently enacted. Both of these provisions, like section 3(b), required application of the "purpose or effect" standard of proof before their tests, devices or practices could be retained.

Those practices which Congress deemed patently discriminatory were automatically suspended or abolished nationwide. Covered jurisdictions had all of their restrictive practices, whether patently discriminatory or not, suspended. In order to reinstitute such practices in either situation, the purpose or effect test was applied.

This pattern is contrasted with other sections of the Act, notably section 3(c), dealing with non-covered jurisdictions and those practices not automatically suspended or abolished. Section 3(c) permits the court to exercise its continuing jurisdiction for remedial purposes only upon such determination. Once a violation is proved, the practice cannot be reinstituted until the purpose or effect test is satisfied.

Section 3(c) concerns itself with "voting qualification[s] or prerequisite[s] to voting, or standard[s], practice[s], or procedure[s] with respect to voting" enacted subsequent to a judicial determination of a fourteenth or fifteenth amendment violation. 42 U.S.C. § 1973a(c). This provision was set up to reach those "pockets" of discrimination outside of section 4(a)'s covered juris-

---

**16.** The plurality found section 2 to be no more than an elaboration on the fifteenth amendment and therefore the purpose test was required. Due to the court addressing the Act as it was before the 1975 amendments to the Act, this opinion is not dispositive. The other separate opinions do not confront this issue other than tangentially via the fifteenth amendment.

**17.** For those jurisdictions covered by the 1965 legislation, *see* [1970] U.S.Code Cong. & Ad. News 3277, at 3279, for those subsequently

brought under coverage by the 1970 amendments, *see* [1975] U.S.Code Cong. & Ad.News 774, at 779. The 1975 amendments added the State of Texas to the covered jurisdictions.

**18.** The use of poll taxes was so abhorrent that Congress abolished them entirely under section 10.

**19.** See n. 17, *supra.*

diction. The "pocket trigger" provision does not utilize the automatically-pre-sumed-discriminatory approach pioneered in sections 3(b), 4(a) and 5. Instead, these alleged discriminatory "qualifications, pre-requisites, etc." retain the "traditional case-by-case approach." [1965] U.S.Code Cong. & Ad.News 2437, 2475. The significant feature of this provision is that a court must first adjudicate a constitutional violation before the purpose or effect test is applicable to the qualifications, etc.

Section 2, granting the general right to freedom from racially discriminatory voting practices, uses the language of section 3(c), i.e. "qualifications, etc." and it is only reasonable to infer that Congress intended it to apply "across the board" in like manner. It does not apply only to "tests or devices" or "covered" jurisdictions.

In the first instance, the purpose or effect test as used in section 5 is not in reality a substantive standard, but delineates the burden of proof necessary to overcome the "automatic" and "covered" presumptions. Secondly, this argument ignores the structure of the Act and the disparate treatment hierarchy intended by Congress. If Congress had meant to apply the purpose or effect test to section 2 it would have used explicit language as in sections 3(b), 4(a) and 5. If it had intended for "qualifications, etc." to be synonymous with "tests or devices" it would have repeated that phrase or otherwise made it clear it was to be treated similarly.

■ The entire purpose of the Act, when viewed as a whole, was to set up two separate categories of legislation with distinct procedures and standards to handle two types of situations: (1) facially legitimate practices in non-covered areas and (2) patently discriminatory practices and covered areas. To engraft plaintiffs' effect standard onto section 2 would defeat this congressionally-blessed differentiation. That some practices and jurisdictions were initially to be given the "benefit of the doubt" is clearly shown by the legislators who protested the passage of the Act, contending it created "second class states and exempt[ed]

other[ ] [states] which have literacy tests also." [1965] U.S.Code Cong. & Ad.News 2437, 2487, 2537.

Though less significant than statements made contemporaneous with the passage of the Act, it is enlightening to note that there is a current congressional proposal to amend section 2 so that it would require only a showing of discriminatory effect.

In conclusion of this issue, it is apparent that Congress meant to correct those most pervasive and patent categories and jurisdictions of voting discrimination with the less severe purpose or effect test while requiring other categories and jurisdictions whose histories did not reveal such practices to pass constitutional muster, i.e. the purpose only test. There is no legislative history or language in the 1975 amendments which indicates Congress intended to include an effect test under section 2.

An analysis of *Bolden* reveals a majority of six as favoring purpose (intent) as a prerequisite to finding a fifteenth amendment violation.

Justice Stewart's opinion, writing for the plurality, expressed that the purpose (intent) test is a polestar by which fifteenth amendment violations are judged and the evidence was insufficient to find a purpose by their standard, 446 U.S. at 62, 100 S.Ct. at 1497. Justice Stevens specially concurring, *id.* at 87, 100 S.Ct. at 1510, applied a different standard. Justice White opted for the purpose (intent) test but felt "an invidious discriminatory purpose can be inferred...", *id.* at 94–95, 100 S.Ct. at 1514. Justices Marshall, *id.* at 136, 137, 138, 100 S.Ct. at 1537, 1538, Brennan, *id.* at 94, 100 S.Ct. at 1514, and Blackmun, *id.* at 80, 100 S.Ct. at 1506, did not endorse the necessity of proof of purpose (intent) but stated "assuming" or "accepting" that intent was necessary, discriminatory purpose had been shown.

■ For the foregoing reasons, the court concludes that a showing of discriminatory purpose (intent) *is* required to prevail under section 2 as amended in 1975. Effect alone is insufficient.

## B. Constitutional Claims

The several *Bolden* opinions represent the intersection of earlier vote dilution precedents from *Fortson v. Dorsey*, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965) to *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), with more recent holdings on intent under the fourteenth amendment. *Personnel Adm. of Mass. v. Feeney*, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979); *Village of Arlington Heights v. Metro. Housing Devel. Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Notwithstanding the divisions among the members of the *Bolden* court, several principles emerge from their statements of law, read together with *Feeney, Arlington Heights* and *Washington v. Davis.*

■ First, an intent to discriminate is a necessary element of a violation of the fourteenth and fifteenth amendments.[20] Second, discriminatory intent need not be the sole purpose behind the challenged action. *See Arlington Heights v. Metro. Housing Devel. Corp.*, 429 U.S. at 265–66, 97 S.Ct. at 563. Third, the decision maker must have "selected or reaffirmed a particular course of action at least in part 'because of' not merely 'in spite of' its adverse effects upon an identifiable group." *Personnel Adm. of Mass. v. Feeney*, 442 U.S. at 279, 99 S.Ct. at 2296.

Four panels of the Fifth Circuit have considered the meaning of *Bolden*. Three panels agree that intent is required, and that the intent need not be the sole motivation for the challenged act. *Lodge*, 639 F.2d 1358; *McMillan*, 638 F.2d 1239; *United States v. Uvalde Consol. Ind. Sch. Dist.*, 625 F.2d 547.

A panel of the Fifth Circuit has held that Voting Rights Act § 2 applies to school board elections, and that it applies to at-large elections. *United States v. Uvalde Consol. Ind. Sch. Dist.*, 625 F.2d 547. These holdings are binding on this court, as no other panel has held to the contrary.[21] *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981).

■ A punctilious analysis of *Bolden* leads the court to the belief "that the primary, if not the sole, focus of the inquiry must be on the intent of the political body responsible for making the districting decision." *City of Mobile v. Bolden*, 446 U.S. at 90, 100 S.Ct. at 1512. The requisite intent must be discerned in the evidence by use of the legal principles set out in *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597; *Arlington Heights v. Metro. Housing Devel. Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450; *Personnel Adm. of Mass. v. Feeney*, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870. To satisfy the intent standard of the *Bolden* plurality, discriminatory purpose of some sort must be proved; however, plaintiffs are not required to show that it was the sole purpose. *McMillan*, 628 F.2d at 1243.

■ The court must proceed on to determine the extent to which historical discrimination impacts on a minority group's present opportunity for effective participation in the electoral process. *Lodge*, 639 F.2d at 1377; *cf. Lee v. Lee County Board of Ed.*, 639 F.2d 1243, 1260 (5th Cir. 1981) ("a substantial, direct and current segregative effect" required with regard to an interdistrict transfer program in a school desegregation case). Discrimination in other contexts, such as housing, education, employment, economics, health, voting devices, and others, is only relevant to this inquiry to the extent that it affects the present effect of the at-large system itself. The Supreme Court noted in *White v. Regester* that the district court's findings explained

---

20. See discussion *supra* p. 1071.

21. In *McMillan*, 638 F.2d at 1242–43 & nn. 8 & 9 (5th Cir. 1981), the panel held that a vote dilution claim is subject only to the fifteenth amendment, and therefore does not arise under

section 2. The panel adopted the plurality view, however, which was based upon section 2 as it existed prior to 1975. The unamended statute presently has no application to this action.

the history of official racial discrimination ... which at times touched the right of Negroes to register and vote and to participate in the democratic processes. 412 U.S. 755, 766, 93 S.Ct. 2332, 2339, 37 L.Ed.2d 314, 324 (1973). A consideration of the present effects of an at-large system, therefore, does not end with the bare finding that housing patterns are segregated, or educational opportunity has been unequal, or that a lesser percentage of blacks are registered to vote as a result of past voting discrimination by poll tax, literacy tests, or other qualifications or prerequisites. The court will consider to what extent, if any, the at-large system itself contributes to a present denial or equal access to the political process. This will be done with an eye to an "ultimate assessment of the multimember district, overlaid, as it was, on the cultural and economic realties" of the state or political subdivision in question, or in "an intensely local appraisal of the design and impact of the ... multimember district in the light of past and present reality, political and otherwise." *White v. Regester*, 412 U.S. at 769–70, 93 S.Ct. at 2341. An examination of "the results and effects of invidious discrimination, and treatment in the fields of education, health, politics and others" is clearly relevant to this question. *Id.* at 768, 93 S.Ct. at 2340. Unless these are tied by evidence to the effect of the at-large system itself, however, they shed no light on whether the at-large system has a present discriminatory effect.[22]

■ Though the present system was established many years ago, the passage of time cannot transform an unconstitutional system into a constitutional one, if it continues adversely to affect the voting rights of the persons who were its intended victims. *See McMillan*, 638 F.2d 1239.

Thus, the remand requires the court to examine the record and new evidence for proof (1) of discriminatory purpose in the

adoption of the at-large commission system, and (2) that such discriminatory conduct has present adverse effects on plaintiffs.

■ The evidentiary factors this court will examine in sifting the evidence for an invidious legislative purpose are as follows (derived largely from *Arlington Heights*):

(1) The impact of the election plan—whether it bears more heavily on one race than on another. 429 U.S. at 266, 97 S.Ct. at 563.

(2) The historical background of the legislative decision, "particularly if it reveals a series of official actions taken for invidious purposes." *Id.* at 267, 97 S.Ct. at 564.

(3) The "specific sequence of events" leading up to the decision. Sudden changes that counteract events favoring the minority group can show invidious intent. *Id.*

(4) "Departures from the normal procedural sequence." *Id.*

(5) "Substantive departures ... particularly if the factors usually considered important by the decision-maker strongly favor a decision contrary to the one reached." *Id.*

(6) The legislative history, especially contemporary statements by lawmakers, their minutes and reports. *Id.* at 268, 97 S.Ct. at 565.

(7) The trial testimony of those involved in the decisionmaking process. *Id.* *See McMillan*, 638 F.2d at 1243.

*Feeney* has been interpreted as adding a substantial gloss on the *Washington—Arlington Heights* factors:

Discriminatory purpose, however, implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part "because of", not merely "in

---

**22.** The plurality in *Bolden* noted that "evidence of discrimination by white officials in Mobile is relevant only as the most tenuous and circumstantial evidence of the constitutional invalidity of the electoral system under which they attained their offices." 446 U.S. at 74, 100 S.Ct.

at 1503. This is clearly the holding of *Feeney* and *Arlington Heights* which were foreshadowed in *Washington v. Davis*. A similar rule should apply to the present effects requirement.

spite of", its adverse effects upon an identifiable group.

(citations omitted), *Personnel Adm. of Mass. v. Feeney*, 442 U.S. at 279, 99 S.Ct. at 2296. This court reads *Feeney* as simply rejecting, as a complete measure of constitutional intent, the "awareness of consequences" or "foreseeability" argument. Such is still a factor to weigh in the analysis.

### C. *Application of Law to Facts*

Applying the *Arlington Heights— Feeney* standards, the court must first examine the impact of the 1874 amendments on black representation. Here the adverse racial impact of the at-large elections is starkly clear. Where as many as ten blacks had served on the 24-member Board of Aldermen under the July, 1868 law, which had given the Republican governor of Alabama the authority to appoint all members of Mobile's city government, all black candidates were defeated in the elections subsequent to 1874.

The historical background leading up to the express codification of the at-large feature reveals a series of specific official actions taken for invidious purposes, and the specific sequence of events leading up to the amendment's enactment involves certain changes that counteracted the enfranchisement of blacks, including both procedural and substantive departures from the normal course of events. From 1828 through the Civil War, Mobile was governed by a bicameral legislature, half of which, the Board of Aldermen, were elected solely by the voters of their wards. However, free blacks were explicitly excluded from the right to vote or hold office. This same ward election scheme was readopted by the Conservative controlled legislature in 1866, again excluding blacks. The Reconstruction Republican government of Alabama established an appointive system of Mobile municipal government to insure that blacks and white Republicans who favored the black franchise would be in control. The January, 1870 statute that provided for a return to popular elections in Mobile used a formula of appointing a new government in February, 1870, to be followed by popular elections in December, 1870. When the December elections took place, without express statutory directives, pure at-large voting was allowed. The only explanation for utilization of such a scheme was to abandon ward elections as followed for 42 years and intentionally emasculate the black vote. The subsequent codification of this procedure in 1874 was likewise passed with the same invidious intent. No black has been elected to a position in Mobile's city government since.

The specific sequence of events leading up to the 1874 municipal act includes the November 4, 1874 legislative elections which affirmed control in Alabama by white supremacists. The intensely racist character of the 1874 election was clear and specific. The legislature that convened immediately after the elections had as its primary program the swift and thorough removal of all Reconstruction laws that threatened white supremacy. The Act reorganizing Mobile's government and permanently installing at-large general elections for all city offices passed the legislature before the month of November was out. However, previously the Democratic Party in Mobile had begun in 1872 conducting primary elections to nominate its candidates for city office, and in these primaries both the councilmen and aldermen were nominated (de facto elected) solely by the voters of their wards. From 1874 until the adoption of the commission form of government in 1911, Mobile's councilmen were selected solely by the voters of their own wards in the only election that counted, the Democratic Primary. The general elections, the only ones in which most blacks were allowed to participate, were conducted strictly at-large.

The contemporary statements by Democratic leaders made explicit the invidious purpose of the two-tier election scheme for Mobile—ward elections in the Democratic primaries and at-large elections in the general elections. That purpose was the insurance of an all-white municipal government and the total exclusion of black office holding.

The court concludes on the basis of this analysis and on the basis of the testimony of plaintiffs' expert historian that the 1874 statute reorganizing Mobile's municipal government was adopted with the invidious purpose of maintaining at-large general municipal elections, along with ward elections in the Democratic primaries, in order to foreclose the possibility of blacks being elected.

The change state-wide in 1907 was effectuated with little or no support from Mobile. The institution of single-member district elections immediately resurrected the race issue in Mobile. This occurred despite substantial black disfranchisement in 1897 and 1901. Consequently, Mobile legislators, local politicians and civic leaders quickly endorsed the commission government "reform" with its concomitant at-large procedure. The first commission bill was introduced in 1909, the year after the election in which Mayor Pat Lyons, the leader of what was then called a "political machine", had been accused by his opponents of attempting to use black and Creole voters to maintain the control of his political faction. Even though the state Democratic Executive Committee had apparently squelched black and Creole voting in the Mobile Democratic primary in 1908, the reintroduction of single-member ward general elections in 1907, as a result of the statewide Municipal Reorganization Act, preserved the possibility that these "colored" voters could and did in one ward, where most of the enfranchised blacks lived, influence the outcome in some of the city elections. Mobile's business and professional leaders expressed vociferous opposition to the 1907 scheme of single-member districts and were determined to return to exclusively at-large elections.

Additionally, the introduction of the commission government proposal coincided with a preoccupation among these same white leaders with fear of federal intervention on behalf of blacks and their gradual refranchisement under the facially neutral poll tax, literacy tests, and property requirements. A proposed constitutional amendment in 1909 to relieve the severity of the poll tax was opposed with this explicit racial concern, and prominent white Mobilians strongly supported a proposed constitutional amendment explicitly to outlaw black office holding. This court has concluded, after considering new evidence on remand that, as a matter of fact, the period leading up to the adoption of commission government in 1911 was not completely "race-proof". Whites openly advocated the adoption of new measures to back up the 1901 disfranchising provisions in anticipation of a resurgent black vote.

This court concludes, on the basis of this analysis and on the basis of the testimony of plaintiffs' historian, that, although the desire to place the business and professional classes in control of Mobile's government and to exclude the lower classes from participation was an important factor in adopting the commission government in 1911— at-large elections—invidious racial reasons played a substantial and significant part. In its original opinion, this court speculated with respect to the 1911 Act that "[t]here can be little doubt as to what the legislature would have done to prevent the blacks from effectively participating in the political process had not the effects of the 1901 Constitution prevailed." *Bolden v. City of Mobile*, 423 F.Supp. at 397. The evidence presented in the trial on remand demonstrates that the commission form of government was adopted in substantial part to reinforce the 1901 Constitution as a buttress against the possibility of black office holding. As required by *Feeney*, this court determines the at-large form of government was adopted in 1911 "because of" and not "in spite of" its dilutive impact on black electoral strength.

No evidence was introduced which would permit this court to find or infer that the amendments to Mobile's commission election scheme in 1939 and 1945, the annexations of white suburbs in 1955 and 1956, and the 1965 amendment to the commission act were enacted for racially discriminatory purposes. These changes were in the nature of "fine-tuning" the apparatus as unforeseen difficulties developed. There is no

evidence of racial animus in any of these actions; indeed, bona fide non-racial reasons for the changes are readily apparent. Plaintiffs also point to the annexations in Mobile in 1955–56 as part and parcel of an overall conspiracy to maintain the dilutive effect of the at-large scheme. There is insufficient evidence to support this claim.

In its original opinion, this court held that because blacks were then effectively disfranchised by the 1901 Constitution, the 1911 statute which established the at-large commission system in Mobile could not have been racially motivated. This court on remand has, of course, considered historical evidence presented for the first time that the 1911 period was not, as a matter of fact, "race-proof" and in consideration of that evidence found the 1911 period was not "race-proof". It is also a fact that the majority of black voters in Mobile was denied by state action the opportunity to participate in either the passage of the 1911 legislation or the subsequent referendum election which adopted the at-large commission system. There was racially discriminatory intent in the adoption of the commission form of government for Mobile. This was in violation of the fifteenth amendment right to vote and the fourteenth amendment right to equal protection of the laws.

The at-large system was adopted by interpretation in December, 1870, and maintained until 1907, when single-member districts were reinstituted. In 1911 at-large elections were again installed and maintained until the present. In each case the at-large form was adopted because it was clear to the Alabama Legislature and to Mobile's white leaders that the at-large form would ensure that the black minority in 1911 and earlier in 1874 would never be able to elect a black representative. Therefore, the 1911 plan for elections at-large was enacted with one of its purposes (intent) to discriminate against blacks. As this court has previously found, the effects

of this intent remain to this day. Since 1874, no black has ever been elected to municipal government in the City of Mobile.

The above finding should not be misunderstood as reflecting any opinion, or containing any suggestion, that at-large systems are per se unconstitutional. Where a specific legislative intent in the enactment is demonstrated, however, the fact that no minority representative has ever been elected becomes something other than the "natural tendency" of features such as at-large plans and majority vote requirements. *See City of Mobile v. Bolden*, 446 U.S. at 74, 100 S.Ct. at 1503. This court has attempted to show the precise "present effect" of the at-large system because the tendency of the Supreme Court appears to be toward a particularized inquiry.[23]

It is nevertheless not entirely clear that the court will demand so close a scrutiny of the present effect of an at-large plan than that found, except where there has been a change in structure of a governmental body. In *White v. Regester*, the court examined a much broader range of evidence in concluding that discriminatory intent had been established. Although the fate of *Regester* as a test for discriminatory intent in the enactment is at best uncertain after *Bolden*, the court's opinion in *Regester* reviews the present effect of the Dallas and Bexar County at-large plans in the context of several other forms of discrimination. *Accord, Lodge*, 639 F.2d 1358.

As this court has previously found, bloc voting continues to occur in Mobile. Analysis of the political campaigns and elections of representative bodies in Mobile County since 1962, when blacks first became a significant political force since Reconstruction times, shows that the candidates and issues favored by black voters or otherwise associated with black community interests have been uniformly defeated by a bloc-voting white electorate. Analysis of the election

---

**23.** *Cf. City of Mobile v. Bolden*, 446 U.S. at 74, 100 S.Ct. at 1503, (plurality): "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful. The ultimate question remains whether discriminatory intent has been proven in a given case." [but present effect has not been eliminated as a factor].

returns for several national and local offices in 1980, including the unsuccessful candidacy of a black lawyer who sought the office of Circuit Judge of Mobile County in 1980, demonstrates that the pattern of racial vote dilution continues in Mobile County to the present time. This voting along racial lines "enhances the likelihood that those seeking to manipulate the electoral system for discriminatory purposes" will succeed. *Lodge*, 639 F.2d at 1378, n. 41.

The present effect of the at-large system, as a function of its original intent, is to enhance the discriminatory results of other forms of de jure and de facto discrimination in voting practices and procedures. These other forms of discrimination in turn enhance the present effect of the at-large system, to deny equal access to the political system. The present effects are set out in the court's original findings, which were not challenged on appeal. *See Bolden v. City of Mobile*, 423 F.Supp. at 387–94. The court reaffirms these findings including the finding that the system, now found to have been established with discriminatory intent, is unresponsive to the needs of the plaintiffs.[24]

Based upon the above analysis and the findings of fact, the court holds that one of the principal motivating factors for the at-large election system for the Mobile City Commission was the purpose (intent) to discriminate against blacks, and to deny them access to the political process and political office. The court further holds that the effects of this discriminatory intent continues to the present. The plaintiffs have met their burden of proof and the court holds that the at-large plan violates Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, 42 U.S.C. § 1983, and the fourteenth and fifteenth amendments to the United States Constitution.

Pursuant to the rule of *Wise v. Lipscomb*, 437 U.S. 535, 98 S.Ct. 2493, 57 L.Ed.2d 411 (1978), the court will withhold entry of a remedial order to provide the State of Alabama the opportunity to enact a constitutional election plan reasonably prior to a city election in August, 1983. Those considering a plan should be mindful of Justice Blackmun's admonition to this court in this case to consider expanding the size of the Mobile city commission type of government such as is now in existence with the election of at least some of the commissioners at-large.

In the past city commissioners have always been elected, either de jure or de facto, to serve in designated capacities. In drafting an alternative commission form of government the constitutional problem of an all single-member district commission form of government should be considered. Grave legal questions of constitutional proportion might be presented under the fourteenth amendment clause "nor deny to any person within its jurisdiction the equal protection of the law", for a plan of only single-member district commissioners. A commissioner elected at-large who would have the sole appointive responsibility of designating the duties of the district elected commissioners may be one solution of this problem. This does not mean that the at-large commissioner should not be given other duties. This should not be interpreted to mean that the legislature is prohibited from considering other alternatives including an alternative form of government with single-member districts if in its wisdom such remedy is preferable.

Upon motion of one or more of the parties, or upon the court's own motion, if it appears that no such legislative response will be made in time for the 1983 elections, the court will carry out its responsibilities under *East Carroll Parish School Board v.*

---

**24.** In this court's view this analysis of present effect, assuming a finding of discriminatory intent in enactment, is a more appropriate means of determining blacks' present access to the political system as a function of an at-large system. Discrimination in the South has been a seamless web; those who would discriminate have first looked to the general conditions of society in which their discriminatory acts would operate. Such occurred in this case. The court's analysis of the facts in *White v. Regester*, as regards present effect, is explicitly based upon this premise.

*Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976), to develop and implement a remedial plan.

The plaintiffs are entitled to recover their costs and attorneys' fees, in amounts to be determined by subsequent orders of this court.

This court retains jurisdiction of this action pending further orders to ensure compliance with this decree.