**Charlie HARRIS and Mose Batie, individually and on behalf of all others similarly situated, Plaintiffs,**

v.

**Don SIEGELMAN, in his official capacity as Attorney General of Alabama, et al., Defendants,**

**John W. Jones, Jr., as Judge of Probate of Dallas County, Alabama; et al., Defendant–Intervenors.**

Civ. A. No. 84–T–595–N.

United States District Court, M.D. Alabama, N.D.

June 30, 1988.

James U. Blacksher, Birmingham, Ala., Terry Davis, Montgomery, Ala., Julius Chambers, Lani Guinier, New York City, Larry T. Menefee, Birmingham, Ala., for plaintiffs.

Joseph E. Faulk, Troy, Ala., for defendants Powell & Anderson.

Charles Graddick, Atty. Gen., Gregory Griffin, David Christy, Asst. Attys. Gen., Montgomery, Ala., for defendants Stone, Seigelman, Wallace, Hale, Tallapoosa, Clay, Cherokee, Barbour & Marengo.

Hobson Manasco, Jr., Haleyville, Ala., for Winston County—Judge, Clerk & Sheriff.

Robert J. Teel, Teel & Teel, Rockford, Ala., for Coosa Co. Democratic Executive Committee.

Richard H. Ramsey, III, Dothan, Ala., for Houston County—Sheriff, Probate Judge, & Circuit Clerk.

Frank C. Ellis, Jr., Wallace, Ellis, Head & Fowler, Columbiana, Ala., for Shelby County—Judge of Probate, Circuit Clerk, & Sheriff.

Harold V. Hughston, Jr., Hughston, Hughston & Hughston, Tuscumbia, Ala.,

for Colbert County—Probate Judge, Circuit Clerk, & Sheriff.

James C. Wood, Mobile, Ala., for Mobile County—Election Appointment Bd.

Louis C. Rutland, Union Springs, Ala., for Bullock County—Probate Judge, Sheriff, & Circuit Clerk.

Kirtley W. Brown, Marion, Ala., for Perry County—Probate Judge, Sheriff & Circuit Clerk.

J. Knox Argo, Argo & Enslen, Montgomery, Ala., for Montgomery County—Judge of Probate, Circuit Clerk, & Sheriff.

Edwin A. Strickland, & Max C. Pope, Fulford, Pope & Natter, Birmingham, Ala., for Jefferson County—Probate Judge, Circuit Clerk, & Sheriff.

Cartledge W. Blackwell, Jr., Blackwell & Keith, Selma, Ala., for Dallas County—Probate Judge, Circuit Clerk, & Sheriff.

John H. England, Jr., England & Bivens, Tuscaloosa, Ala., for Greene County—Probate Judge, Sheriff, & Circuit Clerk.

Woodford W. Dinning, Jr., Lloyd, Dinning, Boggs & Dinning, Demopolis, Ala., for Marengo County—Probate Judge, Circuit Clerk, & Sheriff.

Wallace H. Lindsey, III, Butler, Ala., for Choctaw County—Sheriff, Circuit Clerk, & Judge of Probate.

Warren Rowe, Rowe, Rowe & Sawyer, Enterprise, Ala., for Coffee County—Probate Judge, Circuit Clerk, & Sheriff.

Henry B. Steagall, III, Steagall & Adams, Ozark, Ala., for Dale County—Probate Judge, Circuit Clerk & Sheriff.

Robert D. McWhorter, Jr., Buttram & McWhorter, Centre, Ala., for Cherokee County—Judge of Probate, Sheriff, & Circuit Clerk.

James W. Webb, Webb, Crumpton, & McGregor, Montgomery, Ala., Assoc. of County Comm—amicus curiae.

Ted Taylor, Prattville, Ala., for Autauga County—Probate Judge, Sheriff, & Circuit Clerk.

Tom Nicholson, Maddox, MacLaurin, Nicholson & Thornley, Jasper, Ala., for Walk-

er County—Probate Judge, Circuit Clerk, & Sheriff.

Julian D. Butler, Butler & Royer, Huntsville, Ala., for Madison County—Judge of Probate, Circuit Clerk, & Sheriff.

John R. Phillips, Phillips & Rice, Anniston, Ala., for Calhoun County—Sheriff, Circuit Clerk, & Probate Judge.

James G. Lee, Lee, Barrett & Mullins, Tuscaloosa, Ala., for Tuscaloosa County.

B.J. McPherson, Oneonta, Ala., for Blount County—Judge of Probate, Circuit Clerk, & Sheriff.

Hellums & Meigs, Centreville, Ala., for Bibb County.

John Hollis Jackson, Jr., Clanton, Ala., for Chilton County—Circuit Clerk, Judge of Probate, & Sheriff.

Fine & Associates, Russellville, Ala., for Franklin County.

Wayne H. Smith, Heflin, Ala., for Cleburne County—Judge of Probate, Sheriff, & Circuit Clerk.

H. Edward McFerrin, Poole & McFerrin, Greenville, Ala., for Butler County—Probate Judge, Sheriff, & Circuit Clerk.

Alton L. Turner, Turner & Jones, Luverne, Ala., for Crenshaw County—Judge of Probate, Circuit Clerk, & Sheriff.

Jonathan A. (Alex) Brown, Young, Gosa & Brown, Vernon, Ala., for Lamar County.

Allen Grocholski, Holder, Moore & Grocholski, Fayette, Ala., for Fayette County.

Houston & Martin, Eufaula, Ala., for Barbour County—Judge of Probate, Circuit Clerk & Sheriff.

Charles S. Conley, Montgomery, Ala., for Macon County.

Frederick L. Fohrell, and H. William Wasden, Asst. Legal Advisors to the Governor, Montgomery, Ala., for defendant Hunt.

Joe Espy, III, Melton & Espy, Montgomery, Ala., for State Democratic Exec. Comm.

## MEMORANDUM OPINION

MYRON H. THOMPSON, District Judge.

The plaintiffs in this class-action lawsuit charge that the way in which black voters have been treated at polling places across Alabama and the manner in which poll officials have been appointed across the state violate § 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C.A. § 1973.[1] The plaintiffs, Charlie Harris and Mose Batie, are black citizens of Alabama, and they have brought this lawsuit on behalf of themselves and all other black citizens in this state. They seek relief from the Governor and the Attorney General of the State of Alabama. For reasons that follow, the court concludes that the plaintiffs have established violations of § 2, and are thus entitled to appropriate relief from these two defendants.

### I.

The plaintiffs brought this lawsuit on April 30, 1984. They named as defendants the Governor and Attorney General of the State of Alabama, the State Democratic Executive Committee, and those local officials in Pike County, Alabama responsible

---

1. Section 2, as amended, provides as follows:
   (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State of political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2), as provided in subsection (b).
   (b) A violation of subsection (a) is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to partic-

ipation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.
   42 U.S.C.A. § 1973.

for appointing poll officials for that county. The court later granted the appointing authorities for Dallas and Jefferson Counties leave to intervene.

Poll officials are selected in each county by an appointing authority composed of the county probate judge, the county sheriff, and the clerk of the county circuit court. 1975 Ala.Code § 17–6–1. For both primary and general elections, the appointing authority appoints poll officials from lists provided by the chairpersons of the state or county executive committees responsible for conducting primaries or nominating candidates for election. 1975 Ala.Code §§ 17–6–6 (general election), 17–16–17 (primary election). The same persons are, for the most part, re-appointed each year, as long as they are willing to serve.

On August 1, 1984, the court issued a preliminary injunction requiring that all but one of Alabama's 67 county appointing authorities appoint more black persons as poll officials. *Harris v. Graddick (Harris I)*, 593 F.Supp. 128 (M.D.Ala.1984). The court also certified, pursuant to Fed.R.Civ. P. 23(a) & (b)(2), a plaintiff class of all black citizens in Alabama and a defendant class of all county appointing authorities in Alabama except the one excluded from the preliminary injunction.[2] *Id.* at 136–37. The court later excused another county appointing authority from the preliminary injunction and the defendant class.[3]

On July 19, 1985, the court approved a settlement among the plaintiffs, the State Democratic Executive Committee and the 65 county appointing authorities remaining in this lawsuit. *Harris v. Graddick (Harris III)*, 615 F.Supp. 239 (M.D.Ala.1985). The settlement, for the most part, extends the preliminary injunction until December 31, 1988, but sets forth more detailed requirements for increasing the number of black poll officials across the state during that time. Compliance with the injunction is insured by mandatory, detailed record keeping and the opportunity for renewed judicial scrutiny if necessary. *Id.* at 244–49.

The plaintiffs continued, however, to pursue their § 2 claims against the Governor and the Attorney General, and it is the claims against these two state officials that are now before the court.

## II.

A violation of § 2, as amended, is established if official action was taken or maintained with a racially discriminatory "intent" or the action has racially discriminatory "results." *McMillan v. Escambia County*, 748 F.2d 1037, 1046 (5th Cir.1984) (former Fifth); *Dillard v. Baldwin County Board of Education*, 686 F.Supp. 1459 (M.D.Ala.1988). The plaintiffs have established both an intent and a results claim against the Governor and the Attorney General.

### A.

■ A plaintiff may establish a prima facie case of discriminatory intent under § 2 by showing, first, that racial discrimination was a "substantial" or "motivating" factor behind the enactment or maintenance of the challenged practice and, second, that the practice continues today to have some adverse racial effect. *Hunter v. Underwood*, 471 U.S. 222, 228, 233, 105 S.Ct. 1916, 1920, 1923, 85 L.Ed.2d 222 (1985) (Alabama constitutional provision disenfranchising persons convicted of crimes of moral turpitude was enacted for racially discriminatory purpose and continues to have adverse racial effect in violation of the fourteenth amendment); *Dillard v. Crenshaw County*, 640 F.Supp. 1347, 1354 (M.D.Ala.1986) (Alabama legislature intentionally modified at-large election systems across state so as to minimize black voting strength and at-large systems continue to have adverse racial effect in violation of

---

**2.** The Jefferson County appointing authority later moved to dissolve or modify the preliminary injunction, but the court denied the motion. *Harris v. Graddick (Harris II)*, 601 F.Supp. 70 (M.D.Ala.1984).

**3.** The appointing authorities for Conecuh and Winston Counties were excluded. *See Harris v. Graddick (Harris III)*, 615 F.Supp. 239, 241 ns. 1 & 2 (M.D.Ala.1985).

§ 2).[4] If the plaintiff establishes these two elements, the burden then shifts to the defenders of the practice to demonstrate that it would have been adopted without the purposefully discriminatory factor. *Hunter*, 471 U.S. at 228, 105 S.Ct. at 1920; *Dillard*, at 1355. *See also Mt. Healthy City School District v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). The plaintiffs here have met their burden, and the defendants have not.

The credible evidence, gathered primarily from expert testimony and treatises, as well as from judicial knowledge of reported relevant cases, reaches back into the late nineteenth century, when, in the late 1860's, the Republicans temporarily gained control in Alabama and were able both to author a new constitution that provided for universal suffrage and to have a significant voice in the state legislature.[5] In 1870, however, with the beginning of the so-called "redemption" period, the Democratic party, which openly and vigorously promoted white supremacy, won the governorship and control of the house, and, in 1874, the Democrats regained complete control of the state government.

Following this "redemption" by the white-supremacist Democratic party, and with the rise of the Populist movement in the 1890's, there was substantial concern about continued black participation in the political process. Since the Populist movement had considerable support among black persons and poor white persons, steps had to be taken to prevent these two groups from joining together in potentially powerful coalitions. Two of the measures

frequently used were out-right intimidation and fraud. The Democrats recognized that poll officials could be an important and effective tool in carrying out these measures, and the party therefore openly used these officials to control and neutralize the black vote. But the state officials soon came to realize that these open tactics too often generated costly election challenges and could even lead to a return of federal control, and they therefore sought a more respectable and cunning way of controlling or disenfranchising black voters. In 1893, therefore, the state enacted a complex election statute known as the Sayre Law.

The discriminatory intent of the Sayre Law was evident to all at the time. In its February 14, 1893, edition, the Mobile Register Newspaper summarized the remarks of the law's main sponsor as follows:

> Sayre, the author of the bill, made a plain and straightforward explanation of the bill and its purposes, and called upon every member of the house who felt that he wanted to preserve white supremacy, without the necessity of resorting to the fraudulent practices now so generally charged to be in vogue, to vote with him for the passage of the bill, which he felt would largely remove the negro from politics. He felt that there was a public sentiment now which approved these acts.

The discriminatory effect of the complex law was not, however, apparent from its face. As one historian explained,

> The goal of the Sayre Bill was to let the Negro vote, even to urge him to vote— but to establish an intricate procedure

4. *See also Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252, 264–66, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977) (city did not deny rezoning for reasons of race in violation of the fourteenth amendment); *NAACP v. Gadsden County School Board*, 691 F.2d 978, 981 (11th Cir.1982) (at-large election system for school board members was adopted for racially discriminatory purpose and continues to have adverse racial impact in violation of the fourteenth amendment). *See also* Note, *The Constitutional Significance of the Discriminatory Effects of At-large Elections*, 91 Yale L.J. 974, 976–77 (1982).

5. The principal cases and treaties relied on by the court are: *Dillard v. Crenshaw County*, 640

F.Supp. 1347 (M.D.Ala.1986); *Bolden v. City of Mobile*, 542 F.Supp. 1050 (S.D.Ala.1982). J. Kousser, *The Shaping of Southern Politics: Suffrage Restriction and the Establishment of the One–Party South, 1880–1910*, 130–34, (1974); M. McMillan, *Constitutional Development In Alabama, 1798–1901: "A Study in Politics, the Negro, and Sectionalism"*, 222–223 (1978); D. Bagwell, *The "Magical Process"; The Sayre Election Law of 1893*, The Alabama Review, 83–91 (April 1972).

The court also relies in large measure on the expert testimony of Peyton McCrary, a historian, and Chandler Davidson, a sociologist.

and partisan election officials in order to place the votes of Negroes in the conservative column: i.e., merely to reinforce the more direct system already obtaining in the Black Belt.

D. Bagwell, *The "Magical Process": The Sayre Election Law of 1893*, The Alabama Review, 83, 95 (April 1972). This historian then graphically explained the central role of poll officials in the corrupt process:

> The bill did not institute genuine disfranchisement; nor was it "open and above board." It was a cool, deliberate move toward election fraud. Consider what happened to the illiterate voter approaching the polls. If he attempted to bluff his way through without admitting his illiteracy, he faced three impenetrable barriers: (1) a printed card explaining the voting process (sec. 26); (2) an Australian ballot with no straight ticket voting method (sec. 21); and (3) a five minute limit in which to attempt to understand it all (sec. 31). The illiterate voter had no choice, he had to submit to the election official for help. This was little better. Upon his swearing on oath to his illiteracy, the voter was provided with aid in the form of the polling inspector or an aide appointed by him (sec. 33), both of whom received their commission from the Governor.

*Id.* at 95–96 (footnotes omitted).

The fraudulent goals of the Sayre Law were fully realized. As the president of the State Senate admitted in 1901, he would never vote to repeal the Sayre Law "because it is the best and cheapest method of swindling, the white people had ever devised for the maintenance of white supremacy." M. McMillan, *Constitutional Development In Alabama, 1798–1901: "A Study in Politics, the Negro, and Sectionalism"*, 222, 225 (1978). The critical role that poll officials played in achieving these goals was also acknowledged early. The Senate president went on to say that, under the Sayre Law,

> the blind and the ignorant are practically disfranchised.... when they want to go to vote now, and are unable to fix their own tickets they have to go to the fixer,

and this is practical disfranchisement, for we have learned that the cheapest way is to fix the fixer instead of the voter.

*Id.*

Therefore, beginning as early as the 1870's, in addition to using out-right fraud and intimidation, the state designed the office of poll officials, including its appointment process, to exclude blacks from service and to assure that those white poll officials appointed would act in whatever way necessary to prevent blacks from casting ballots for the candidates of their choice.

The Populist movement not only inspired the Sayre Law, it also set off a century-long pattern by the state legislature of shifting between local single-member districts and at-large systems so as to minimize black voting strength. Moreover, in the 1950's and 1960's, in response to a judicial ban on all-white primaries, *see Smith v. Allwright*, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944), the legislature modified these local at-large systems to make them even more secure mechanisms for discrimination. The state first passed laws in the 1950's banning single-shot voting. These laws were then repealed in 1961 and replaced with laws requiring that local candidates run for numbered places. The motivation behind numbered place laws and laws banning single-shot voting was the same: to make it more difficult for black voters to elect candidates of their choice.

In addition to implementing and maintaining at-large elections, reinforced by anti-single-shot voting and numbered places laws, the state engaged in numerous other efforts to disenfranchise black voters, beginning in this century with the Constitutional Convention of 1901. As the Supreme Court recently commented in another case, "the Alabama Constitutional Convention of 1901 was part of a movement that swept the post-Reconstruction South to disenfranchise blacks. .... The delegates to the all-white convention were not secretive about their purpose." *Hunter*, 471 U.S. at 228–31, 105 S.Ct. at 1920–21. The 1901 Constitution contained so many

different voter qualifications that by 1909 all but approximately 4,000 of the nearly 182,00 black persons of voting age in Alabama had been removed form the rolls of eligible voters.

Moreover, shortly after the all-white primaries were struck down, the state passed a series of laws requiring black persons who wished to register and vote to satisfy different and more stringent standards and tests than white persons. *See, e.g., United States v. Parker*, 236 F.Supp. 511 (M.D. Ala.1964); *United States v. Penton*, 212 F.Supp. 193 (M.D.Ala.1962); *Davis v. Schnell*, 81 F.Supp. 872 (S.D.Ala.), *aff'd* 336 U.S. 933, 69 S.Ct. 749, 93 L.Ed. 1093 (1949). Other barriers placed in the way of black voters after 1944 included racial gerrymandering, *Sims v. Baggett*, 247 F.Supp. 96 (M.D.Ala.1965), and discriminatory administration of the poll tax, *United States v. Alabama*, 252 F.Supp. 95 (M.D.Ala. 1966).

These efforts to keep black persons from voting and being elected to office paralleled and complemented the state's efforts to discriminate against black persons in all other areas of their lives. In *Dillard v. Crenshaw County*, 640 F.Supp. at 1359–60, this court chronicalled these efforts as follows. As children, black persons were required to go to segregated schools, *see, e.g., Lee v. Macon County Bd. of Ed.*, 231 F.Supp. 743 (M.D.Ala.1964) (three-judge court), play in segregated parks, *Gilmore v. City of Montgomery*, 176 F.Supp. 776 (M.D.Ala.1959), *modified and aff'd*, 277 F.2d 364 (5th Cir.1960), and use segregated recreational facilities. *Smith v. Y.M.C.A.*, 316 F.Supp. 899 (M.D.Ala.1970), *aff'd as modified*, 462 F.2d 634 (5th Cir.1972). As they grew up, black persons faced continued discrimination in employment, *see, e.g., Paradise v. Prescott*, 585 F.Supp. 72 (M.D. Ala.1983), *aff'd*, 767 F.2d 1514 (11th Cir. 1985), *aff'd sub nom. United States v. Paradise*, 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987) (racial discrimination in promotion of state troopers); *NAACP v. Allen*, 340 F.Supp. 703 (M.D.Ala.1972), *aff'd*, 493 F.2d 614 (5th Cir.1974) (racial discrimination in hiring of state troopers); *United States v. Frazer*, 317 F.Supp. 1079

(M.D.Ala.1970) (four departments of Alabama state government with a total of approximately 3000 employees engaged in pattern or practice of employment discrimination against blacks); *Marable v. Alabama Mental Health Board*, 297 F.Supp. 291 (M.D.Ala.1969) (three-judge court) (state mental health board discriminated against black employees), cultural opportunities, *Cobb v. Montgomery Library Board*, 207 F.Supp. 880 (M.D.Ala.1962) (blacks excluded from public library and museum), and even their private lives. *United States v. Brittain*, 319 F.Supp. 1058 (N.D.Ala.1970) (miscegenation laws).

Furthermore, no matter what form of public transportation they chose, black persons were subjected to segregation. *See, e.g., United States v. City of Montgomery*, 201 F.Supp. 590 (M.D.Ala.1962) (state-imposed segregation in municipal airport facilities); *Lewis v. Greyhound Corp.*, 199 F.Supp. 210 (M.D.Ala.1961) (state policy of maintaining segregated bus terminals); *Browder v. Gayle*, 142 F.Supp. 707 (M.D. Ala.) (three-judge court), *aff'd mem.*, 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114 (1956) (segregated city buses required by state statute and city ordinance). Black mental patients were placed in segregated and inferior public hospitals, *Marable*, 297 F.Supp. at 294, and black persons were discriminated against on both sides of the legal system; they were routinely excluded from juries, *see, e.g., Black v. Curb*, 464 F.2d 165 (5th Cir.1972), and they were kept in segregated quarters in the state's jails and prisons. *Washington v. Lee*, 263 F.Supp. 327 (M.D.Ala.1966) (three-judge court), *aff'd* 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968).

As the late Judge Richard T. Rives stated, "from the Constitutional Convention of 1901 to the present, the State of Alabama has consistently devoted its official resources to maintaining white supremacy and a segregated society." *United States v. Alabama*, 252 F.Supp. 95, 101 (M.D.Ala. 1966) (three-judge court).

Although after 1901 the state focused more on disenfranchising rather than controlling the black vote, the role of the poll

official did not diminish in this process. The poll official continued to play a "gate keeping" role, to assure that if blacks did slip through and register and vote they voted in a certain way.

Therefore, as this court explained in *Harris I,* at 131, many black citizens of the state have lived great portions of their lives under state and local governments that treated them as inferior citizens who were not to participate in the political, social, and economic life of the state. Moreover, this rule of law and social order was usually enforced by fraud, intimidation and even violence.

The plaintiffs also presented compelling evidence that this history of racial inhumanity continues into today, and, more specifically, that, in the tradition established by this state, white poll officials continue to harass and intimidate black voters. Witnesses detailed numerous instances of where white poll officials refused to help illiterate black voters or refused to allow them to vote, where they refused to allow black voters to cast challenged ballots, and where they were simply rude and even intimidating toward black voters.

The defendants were, however, able to show that these instances of white intimidation and harassment were much less frequent today than in the past. But the plaintiffs presented extremely compelling evidence that, while the instances may be fewer, their impact is still dramatic and widespread in the black community in light of this state's not-so-distant history of open and violent discrimination. Black voters do not view an instance of discrimination as an isolated instance but as part of a pattern and practice, as part of a history of discriminatory treatment. Therefore, even isolated recent instances of discrimination would quickly ripple through the black community and frighten away black voters. In the black community, as the perpetrators of discrimination well know, a little discrimination or a little harassment and intimidation can go a long way.

■ From this history, three things are particularly relevant here. First, the state had an official policy of appointing only white poll officials.[6] Second, the state had an official policy of keeping the electoral process closed to black citizens, a policy enforced both by law as well as through the use of fraud, force and intimidation, often by poll officials. Third and finally, the following two features in the racially-inspired Sayre Law remain on the law books today, codified in 1975 Ala.Code § 17-8-29: (a) requiring that a voter seeking assistance swear an oath to the inspectors that he or she is unable to write the English language; and (b) limiting to five minutes the time that a voter may remain inside the voting booth.[7]

6. The effects of this policy continued up until this court issued its preliminary injunction. The evidence then reflected that,

   across the state black persons are grossly underrepresented as poll officials. Data from the last statewide election, gathered by the plaintiffs, show that in at least 36 of Alabama's 67 counties the percentage of black poll officials ranged from on-half to substantially less than one-half of the percentage of blacks in the county population.

   *Harris I,* at 131.

7. Section 17-8-29 reads as follows:

   Any elector applying to vote who shall state to any of the inspectors that by reason of his inability to write the English language or by reason of blindness or the loss of the use of his hand or hands he is unable to prepare his ballot may have the assistance of any person he may elect. In such case said elector must remain within the polling place and the inspector shall send for the person selected; if the person cannot be found, then such elector may select any other person. An elector who prepares his ballot alone or with the assistance of another shall be permitted to prepare it at any point in the polling place. Any person called in to assist an elector in preparing his ballot shall retire when the elector retires.

   No more than 10 electors shall be allowed in the polling place at the same time. No elector shall remain more than five minutes in, nor shall he be permitted to take his ballot from the polling place.

   In cities or towns of more than 3,000 inhabitants, each elector on receiving the ballot shall forthwith and without leaving the polling place retire alone to one of the booths or compartments provided for that purpose, and there prepare his ballot in the manner herein provided. Any elector applying to vote in such city or town who shall state under oath to any of the inspectors, which said oath may be administered by any one of the inspectors, that by reason of his inability to write the

The evidence further shows that these racially-inspired policies and law continue to have their intended effects today, and therefore violate § 2. First, as this court explained in *Harris I,* at 131, this state's history of fraud, force and intimidation at the polling place continues today to keep black citizens from registering and voting:

The evidence now before the court dramatically and persuasively reflects that many blacks, in particular the elderly and the uneducated, still labor under these past memories of personal humiliation, intimidation and violence. They understandably still harbor strong fears of entering all-white public places, even though they are now legally entitled to do so. They understandably are extremely reluctant to seek assistance from poll officials. They find the simple act of registering and voting, especially when the voting officials are all white, and especially when they must also be subjected to the requirements of § 17–8–29, an extremely intimidating experience; and as a result, many of them do not register, and many of those who do register do not vote. For these persons, the political process is still not open, is still not available to the same extent it is and has been available to white persons.

Second, recent instances—even isolated ones—of intimidation have reinforced this history throughout the black community and have discouraged those blacks who voted in the past from returning to vote again.

But third, and most significantly and distressingly, this history of state-enforced discrimination has had a pervasive and lasting adverse effect on the entire "political socialization" of the black citizens of this state. Because, for most of this century and the last, black citizens were prohibited by the state from participating in the political process, many of them lost interest in the political process and were not concerned with the nuts and bolts of the process. This state-fostered attitude was then passed on through the family structure, from generation to generation, with the result that many black children even today lack interest in politics.

Finally, the plaintiffs presented direct evidence of the present-day effects of the two Sayre Law provisions challenged here. Witnesses related instances of where white poll officials abused these provisions just as they had done almost 100 years ago; they told of instances where black voters were harassed with the five-minute rule or were refused clearly needed assistance because they did not meet the state's rigorous assistance standard or because the white poll officials arbitrarily decided that assistance was not needed.

The plaintiffs have therefore established that the policies and law challenged here are products of intentional discrimination and that these policies and law continue today to have their intended discriminatory effects; and the defendants have not shown that these policies and law would have been adopted in the absence of the state's discriminatory intent. The plaintiffs have established their § 2 intent claim.

English language or by reason of blindness or the loss of the use of his hand or hands he is unable to prepare his ballot may have the assistance of any person he may select. In such case, said elector must remain within the polling place, and the inspector shall send for the person selected. If the person cannot be found, then such elector may select any other person, and, thereupon, said elector and the person so selected shall retire to a booth or compartment, and there the person so selected shall render said elector all such assistance in the preparation of said ballot as he may require, so that the same may be voted for the candidate of his choice, in the manner herein provided. In all other respects, said elector shall vote as is required of other electors.

No candidate for election shall act as assistant to any elector in the preparation of his ballot. When all the booths or compartments are occupied and other electors are waiting to vote, no elector shall occupy a booth or compartment for a longer time than five minutes. No elector shall be allowed to occupy a booth or compartment already occupied by another, nor speak or converse with anyone except as herein provided while in the polling place. After having voted or declined or failed to vote within five minutes, the elector shall immediately withdraw from the polling place and go beyond the prohibited distance and shall not enter the polling place again.

■ The Governor and the Attorney General argue that, to the extent the policies of intimidation and discrimination condemned here continue to exist today, they are the policies of local governments and not the state, and that thus they, as state officials, should not be held accountable for these policies. They argue that the state has now abandoned such policies. However, to the extent the effects and vestiges of the once enforced, but now abandoned, state policies remain extant, the policies themselves remain. It is now settled law that a government guilty of discrimination must "do more than abandon its prior discriminatory purpose," *Dayton Board of Education v. Brinkman*, 443 U.S. 526, 538, 99 S.Ct. 2971, 2979, 61 L.Ed.2d 720 (1979); the government has the "affirmative responsibility" of also redressing any adverse effects of its discriminatory conduct, *id.* The defendants' argument that they have abandoned their past discriminatory policies and that local rather than state government is responsible for any discrimination occurring today, misses the point. The critical question is whether the State of Alabama has redressed the present-day effects of its own past discrimination, and the answer is that it has not.[8] *See* Note, *Eradicating Racial Discrimination in Voter Registration: Rights and Remedies Under the Voting Rights Act Amendments of 1982*, 52 Fordham L.Rev. 93, 104–09 (1983) (discussing affirmative duty of state to redress present-day effects of past voting rights discrimination).

### B.

■ The plaintiffs have also established their § 2 results claim. Section 2, as recently amended, prohibits a "practice or procedure ... which results in a denial or abridgement of the right of any citizen of he United States to vote on account of race or color...." 42 U.S.C.A. § 1973(a). A § 2 results claim is established where the evidence reveals that "as a result of the challenged practice plaintiffs do not have an equal opportunity to participate in the political processes," *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 2763, 92 L.Ed.2d 25 (1986), *quoting* S.Rep. No. 417, 97th Cong., 2d Sess. 28, *reprinted in* 1982 U.S.Code Cong. & Admin.News, 177, 206, or to put it another way, the claim is established, if as a result of the practice, minority voters cannot participate in the electoral process on the same terms and to the same extent as non-minority voters.[9]

■ Furthermore, the proscription of § 2 extends beyond formal barriers to access, such as literacy and residency tests. It also prohibits all practices which, while episodic and not involving permanent structural barriers, result in the denial of equal access to any phase of the electoral process for minority group members. S.Rep. No. 417, 97th Cong., 2d Sess. 30, *reprinted in* 1982 U.S.Code Cong. & Admin.News 177, 207. Section 2's reach, therefore, includes everything from districting schemes that dilute minority voting strength, *see, e.g., Thornburg v. Gingles, supra,* to "refusal to appoint minority registration and election officials," H.Rep. No. 227, 97th Cong., 1st Sess., 14 (1981).

In determining whether a challenged practice results in impaired minority access to the political process, a court is required by § 2 to examine the "totality of the circumstances." 42 U.S.C.A. § 1973(b). In other words, a court must engage in "a searching practical evaluation of the 'past and present reality.'" *Thornburg*, at 78,

---

8. The evidence indeed reflects that many local jurisdictions have discriminated against their black voters. The evidence also reflects, however, that this discrimination by local jurisdictions is a product of earlier state-enforced discrimination and that it has indeed reinforced the earlier discrimination.

9. As this court explained in *Dillard v. Crenshaw County*, 640 F.Supp. at 1354 n. 5, the discriminatory results needed to establish a § 2 violation in the absence of intentional discrimination should not be confused with the present day adverse racial effects needed to establish a § 2 intent claim. The former is more a term of art, established according to certain criteria; whereas, the latter is less stringent and may be met by any evidence that the challenged action is having a significant adverse effect on black persons today. *See* Note, *The Constitutional Significance of the Discriminatory Effects of At-large Elections*, 91 Yale L.J. 974 (1982).

106 S.Ct. at 2781, *quoting* S.Rep. No. 417, 97th Cong., 2d Sess. 30, *reprinted in* 1982 U.S.Code Cong. & Admin.News 177, 208.

In *Thornburg v. Gingles,* the Supreme Court listed nine Congressional factors typically considered in evaluating a results claim.[10] The Court observed that the compilation of these factors is premised on the notion "that a certain electoral law, practice or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Id.* at 47, 106 S.Ct. at 2764–65. These factors are, however, neither comprehensive nor exclusive and other factors may also be relevant and may be considered; moreover, there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other. *Id.* Rather, the number and nature of the factors a court should consider will vary depending on the nature of the § 2 results claim presented. The *Thornburg* Court then refined the above general observations to address the specific type of § 2 results claim presented.

Although the type of results claim presented in *Thornburg* (the ability of minority voters to elect representatives of their choice under different election systems) is different from the type of claim presented here (the treatment of minority voters at polling places), the approach used by the *Thornburg* Court is helpful. The Court required, as a first "precondition" to the challenge presented, that the minority must be able to show that it experiences substantial difficulty in gaining full access to the political process, and, as a second precondition, that the minority be able to demonstrate that its difficulty is in some measure attributable to the challenged election practice.[11]

██ As this court has demonstrated in this memorandum opinion, Alabama black citizens—in particular, the elderly and the uneducated—are extremely reluctant to register and vote due to the discriminatory policies and law challenged here. The evi-

10. These factors are: (1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process; (2) the extent to which voting in the elections of the state or political subdivision is racially polarized; (3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group; (4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process; (5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to effectively participate in the political process; (6) whether political campaigns have been characterized by overt or subtle racial appeals; (7) the extent to which members of the minority group have been elected to public office in the jurisdiction; (8) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; (9) whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous. *Thornburg,* at 35–39, 106 S.Ct. at 2759–60.

11. Because the issue in *Thornburg* was not treatment at the polling place, but rather the ability of minority voters to elect representatives of their choice, the court logically required that a plaintiff show the existence of "racially polarized voting" to meet the first precondition: that is, that the minority group constitutes a politically cohesive unit and that the white majority votes sufficiently as a block, usually to defeat the minority's preferred candidate. *Id.* at 51, 54, 106 S.Ct. at 2767, 2769. As the Court explained, if the minority group is not politically cohesive, it cannot be said that distinctive minority group interests are being thwarted, *id.;* and without significant white bloc voting, usually to defeat minority preferences, it cannot be said that the ability of minority voters to elect their chosen representatives is inferior to that of white voters. *Id.* at 48 n. 15, 106 S.Ct. at 2766 n. 15.

Furthermore, because the questioned choice in *Thornburg* was in the context of a majority vote requirement and because it was between an at-large system and a scheme with a majority-black single-member district, the Court logically required, for the second precondition, that "the minority group ... be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." *Id.* at 50, 106 S.Ct. at 2766.

dence also reflects, however, that in the absence of these policies and law, and with substantial and affirmative measures to remedy their present-day effects, the political process could again be fully available to these black citizens. For example, going into the black community—in particular, among the poor and uneducated—and showing black citizens that they are welcome at the polls and re-educating them regarding their rights to register and vote and to participate in the political process, would go a long way toward dispelling the present-day effects of past discriminatory policies and laws. Also, establishing standards of conduct for poll officials would certainly help.

Moreover, as this court explained in *Harris I*, at 131, increasing the presence of black poll officials would also go a long way toward allaying the fears of many black citizens, and opening up the political process to them. The evidence reflects that poll officials are the "frontline troops" in the political process, and that they play a significant role in the political socialization of a group. The open and substantial presence of black poll officials would therefore be a significant indication to many black persons that voting places are now open to all, that black persons not only have a legal right to come and vote, they are welcome. And, of course, the more black poll officials there are, the greater the confidence black persons will have in the election process, and the less fear they will have about participating in that process.

### III.

■ The final issue for the court is relief. As demonstrated above, the State of Alabama has over the last 100 years adopted and enforced, first, a policy of appointing only white poll officials and, second, a policy of keeping the electoral process closed to black citizens by law and through the use of fraud, force, and intimidation. The state also retains on its law books today the following two provisions from the racially inspired Sayre Law: (a) requiring that a voter seeking assistance swear an oath to the inspectors that he or she is unable to write the English language, and (b) limiting to five minutes the time that a voter may remain inside the voting booth. The evidence also reflects that these policies and law continue today to have substantial adverse effects on the black citizens of this state. The plaintiffs have already entered into a settlement with local appointing authorities to increase the number of black poll officials across the state. This relief is not enough, however; much more is necessary, in particular from state officials. As the Eleventh Circuit Court of Appeals recently instructed this court, the relief fashioned for a § 2 violation must "completely" and "with certitude" remedy the violation. *Dillard v. Crenshaw County*, 831 F.2d 246, 252 (11th Cir.1987).

The court will therefore enter a judgment, first, declaring that the challenged policies and law violate § 2, and, second, enjoining the defendants from further enforcement of them. It should be added that § 17–8–29 authorizes assistance for not only voters who cannot write the English language but also for physically disabled voters. The additional disability provision does not, however, save § 17–8–29 from censure under § 2, because, as the evidence here reflects, white poll officials have recently used § 17–8–29, even with the disability provision, to deny assistance to black voters who clearly needed it. Section 17–8–29's assistance provisions must therefore fall in their entirety. A black voter should receive assistance whenever he or she needs it, and the assistance should come from whomever the black voter chooses, unless the assistance is prohibited by other statutory provisions, federal or state, not challenged here.

The court will also require that the defendants and the plaintiffs submit to the court proposals for the complete eradication of the present-day adverse effects of the policies and law condemned in this opinion. The proposals may include going into black communities across the state to re-educate black citizens about their rights to register and vote and to participate in the political process, and to demonstrate to them that they are welcome to vote in this

state, and, indeed, are encouraged to do so. The proposals may also include establishing standards for how poll officials are to treat voters, in particular elderly and uneducated black voters who may be fearful of the voting process. Any proposal the parties submit must be one that "promises realistically to work, and promises realistically to work *now*." *Green v. County School Board of New Kent County*, 391 U.S. 430, 439, 88 S.Ct. 1689, 1694, 20 L.Ed. 2d 716 (1968) (emphasis in original).

An appropriate judgment will be entered.

## JUDGMENT AND INJUNCTION

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT and DECREE of the court:

(1) That judgment be and it is hereby entered in favor of plaintiffs Charlie Harris and Mose Batie and against defendants Don Siegelman and Guy Hunt;

(2) That it be and it is hereby DECLARED that the following past and present policies of the State of Alabama and their present-day effects violate § 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C.A. § 1973:

(a) The policy of appointing only white poll officials; and

(b) The policy of keeping the electoral process closed to black citizens through the use of fraud, force, and intimidation;

(3) That it be and it is hereby DECLARED that the following provisions in 1975 Code of Alabama § 17–8–29 violate § 2:

(a) Requiring that before any voter may receive assistance he or she must swear an oath to the inspectors that he or she cannot prepare a ballot because he or she is unable to write the English language or is blind or has loss the use of his or her hand or hands; and

(b) Imposing a five-minute time limit on how long a voter may remain inside the voting booth;

(4) That defendants Siegleman and Hunt, their officers, agents, servants, employees, and those persons in active concert or participation with them who receive actual notice of this injunction, be and they are each hereby ENJOINED and RESTRAINED from further enforcement of:

(a) The provisions of § 17–8–29 condemned in paragraph numbered 3 above; and

(b) The two racially discriminatory policies condemned in paragraph numbered 2 above;

(5) That defendants Siegleman and Hunt be and they are hereby DIRECTED to submit to the court, within 35 days, a proposal for the complete eradication of the present-day effects of the state's two racially discriminatory policies and law condemned in paragraphs numbered 2 and 3 above;

(6) That the plaintiffs be and they are hereby DIRECTED to submit to the court, within 49 days, their own counter-proposal or modifications to the defendants' proposal; and

(7) That the plaintiffs be and they are hereby awarded attorney fees and costs.

The court retains jurisdiction over this cause.

The clerk of the court is DIRECTED to issue a writ of injunction.